**KENTUCKY NATIONAL GUARD, Appellant,**

v.

**Larry BAYLES and Workmen's Compensation Board, Appellees.**

Supreme Court of Kentucky.

March 19, 1976.

Leonard S. Price, Louisville, for appellant.

Kelly D. Thompson, Bowling Green, for appellee.

William L. Huffman, Director, Workmen's Compensation Bd., Dept. of Labor, Frankfort, for appellee, Workmen's Compensation Bd. of Kentucky.

LUKOWSKY, Justice.

This is an appeal by the Kentucky National Guard from a judgment of the Warren Circuit Court which affirmed an award by the Kentucky Workmen's Compensation Board of twenty-five percent permanent partial disability benefits to Larry Bayles.

The Governor through the Department of Military Affairs ordered Headquarters and Headquarters Company of the 149th Armored Brigade of the Kentucky National Guard to annual training at Camp Lejeune, North Carolina for a period of seventeen days commencing on March 27, 1973. The order was published in compliance with KRS 38.250(1) and 32 U.S.C. § 502(a)(2) on the express authority of 32 U.S.C. § 503. Bayles was an enlisted member of this unit. During the period of training the members of the unit received federal pay.

While Bayles was returning to his tent on the night of April 8, 1973 he tripped over a tent peg and injured his left knee. This injury was determined to have been incurred "in line of duty." He was taken to the hospital at Camp Lejeune where a cast was applied and then he was sent to the Ft. Knox Army Hospital where surgery was performed. He continued to receive pay and medical treatment from the federal government until July 13, 1973. Thereafter he applied for workmen's compensation benefits with the result previously outlined.

KRS 38.235(1) provides:

"The department of military affairs shall accept the provisions of KRS chapter 342 for the benefit of members of the Kentucky national guard while such members are *on active state service.* . . ."

KRS 342.640(3) states:

" . . . Every person who is a member of the Kentucky national guard, while said member is *on active state service* shall be deemed for the purposes of this chapter to be in the employment of this state."

KRS 38.010(4) defines "*active state service*" as

"(a) The ordering by the governor of any unit or units of the Kentucky national guard to enforce the laws of the commonwealth; resist an actual or threatened invasion or insurrection; quell a riot or other domestic disturbance; or preserve and protect the rights, lives or property of citizens of the commonwealth;

(b) Officers, warrant officers and *enlisted personnel employed under orders of the governor in* making tours of inspection, mustering in or mustering out troops, making surveys of military property, sitting on courts-martial, summary courts, efficiency boards, courts of inquiry or boards of officers or *performance of any other duty directed by the governor or adjutant general*;

(c) The *participation of any unit* or units of the Kentucky national guard *in* gunnery competition or *other training or military exercise* anywhere within or without the United States *except when entitled to receive federal pay.*

The question of Bayles' coverage by the Workmen's Compensation Act is squarely presented. This is a matter of first impression in this commonwealth. The guard contends that 32 U.S.C. § 101(12) which defines "active duty" as including "Federal duty" such as "annual training duty" and the receipt of federal pay converts Bayles' service into federal service to the exclusion of its being "active state service". Bayles contends that he was individually ordered to training duty and that the source of his pay is of no consequence.

The problem is whether Bayles was on "active state service" within the statutory definition at the time of his injury. Perspective requires a thorough understanding of the history of the national guard and the threefold nature of the guardsman.

The "militia clauses" of the constitution of the United States vest in congress the power:

"To provide for calling forth the Militia to execute the Laws of the Union, sup-

press Insurrections and repel Invasions." Article I, Section 8, Clause 15.

"To provide for organizing, arming, and disciplining the militia and for governing such part of them as may be employed in the Service of the United States, *reserving to the States respectively*, the Appointment of the Officers, and *the Authority of training the Militia according to the discipline prescribed by congress.*" Article I, Section 8, Clause 16.

The militia was conceived to be a state force liable only to such federal control as is specified in the constitution and subject to only limited federal use. *Houston v. Moore*, 5 Wheat 1, 18 U.S. 1, 5 L.Ed. 19 (1820). The states on the other hand are not expressly limited in the use of their militia in any way by the federal constitution. The basic nature of the militia as a state force exists today without change.

In the Militia Act of 1792, 1 Stat. 271, establishing a uniform militia, congress provided that all able-bodied white male citizens between the ages of eighteen and forty-five were subject to enrollment in the militia with certain exemptions, specified the arms and equipment the officers and men were to provide for themselves, prescribed the organization and rules of discipline and provided for the care of those disabled while in the service of the United States.

The organization of the militia remained virtually unchanged for over one hundred years. In 1903 an act to improve the efficiency of the militia known as the "Dick Act", 10 U.S.C. § 8501, repealed the 1792 law and provided that the militia would thenceforth consist of two classes, the organized militia (to be known as the national guard of the state or the District of Columbia, organized, armed and disciplined the same as the regular army or volunteer army) and the reserve militia (to include the remainder of the militia). In all respects except one this act established the national guard as it is known today. The one essential difference is the subsequent imposition of federal standards with respect to officer personnel.

The constitution reserves to the states the power of appointment of officers and the authority to train the militia. This reservation created difficulties when the militia was called to the federal service because the qualifications of officers and the state of training of the units varied so much that it was difficult if not impossible to weld these units into a cohesive force. The "Dick Act" was passed to meet one of these problems. The organization as prescribed for the national forces was applied to the militia and a specific training program was set out. To qualify thereafter for federal assistance which was first authorized in 1808 the states were obligated to adopt the prescribed training program. Thus a uniform training program was established and a means of enforcing compliance provided.

In 1916 the National Defense Act, 39 Stat. 166, set out specific qualifications for officers. The federal government could not control the appointment of officers but the pattern of the "Dick Act" could be and was applied. A national guard officer who did not meet these standards was not recognized and not eligible for federal benefits such as pay for training, etc. The act named the classes of persons eligible for appointment and required an examination by a board as to the appointee's fitness.

The National Defense Act of 1916, although the most complete and comprehensive treatment of the militia problem ever undertaken by congress, failed to resolve one crucial problem: the limited federal use of the militia, that is, to repel invasion, suppress insurrection or to execute the laws of the union. In World War I, because of this limitation, the militia could not be called to federal service, but instead was made subject to the draft. In 1933 the act was amended to establish as a reserve component of the Army of the United States, the National Guard of the United States.

The National Guard of the United States was constituted of federally recognized units and officers and men of the national guard appointed or enlisted in the National Guard of the United States. Thus all mem-

bers of the NGUS were also members of the national guard of a state or the District of Columbia.

The years eliminated the racial restrictions on membership in the militia. In 1947, when the Air Force was established, the air units of the NGUS were transferred to and became a reserve component of the Air Force, the Air National Guard of the United States. The same division took place within most, if not all, national guard organizations under state law so that for all practical purposes there is now an air national guard and an army national guard in each state.

The army national guard being a state force is subject to such use as the state may require according to its laws. Guardsmen in active service of the state are entitled to such benefits as may be provided them by state law but are not entitled to any federal benefits unless congress so provides.

The Constitution of the United States, Article I, Section 8, Clause 16, provides that training of the army national guard is not a federal function. Furthermore federal law provides that members of the army national guard when not on active duty pursuant to a presidential call of the militia or activation of the reserve will be administered, armed, uniformed, equipped and trained in their status as members of the army national guard and not in their federal status as members of the Army National Guard of the United States insofar as the federal government is concerned. 10 U.S.C. §§ 3079 and 3495. Therefore, all training of the army national guard is conducted under the auspices of the state. The federal government however prescribes the standards and plays an important role in training by providing federal assistance to the states and substantial benefits to the members. The purpose of these benefits is to induce the states and guard personnel to reach and maintain the state of readiness necessary to perform federal service in case of necessity.

Under regulations prescribed by the secretary each *unit* of the army national guard is required to assemble for training no less than forty-eight times a year and to participate in encampments, maneuvers or other exercises at least fifteen days a year unless excused therefrom by the secretary. 32 U.S.C. § 502(a). The secretary is also authorized to provide for the participation of the army national guard in maneuvers, encampments, or other exercises either independently or in conjunction with the army. 32 U.S.C. § 503.

For the performance of training required or authorized by federal law, federally recognized members of the army national guard are entitled to pay to the extent of availability of federal funds. In the case of full time duty performed under law, 32 U.S.C. § 502(f), full active duty pay and allowances are authorized. 37 U.S.C. § 204.

Members of the army national guard who suffer disability while engaged in any training required or authorized by federal law are entitled to hospitalization and medical treatment and the payment of burial expenses if death results. 10 U.S.C. §§ 3687, 1475, 3721 and 32 U.S.C. §§ 318, 319, 321. Pay and allowances may be authorized during all or part of the period of hospitalization. 37 U.S.C. § 204. If the disability resulted from an injury, disability retirement pay or severance pay may be authorized. 32 U.S.C. §§ 318, 320 and 10 U.S.C. §§ 1204, 1205, 1206. In addition there may be eligibility for compensation benefits through the Veterans Administration. 38 U.S.C. §§ 331, 3104.

This cruise from tedium to apathy makes it painfully apparent that Bayles was training in a state status as a member of the army national guard and not in a federal status as a member of the Army National Guard of the United States, but that nonetheless he was cloaked in a cocoon of federal compensation benefits. This is not to say, however, that such training and status necessarily bring him within the statutory definition of "active state service".

It may be that KRS 38.010(4), defining "active state service", could have been more artfully drawn to accomplish its purpose but it is adequate to do the job. Even a cursory reading of the statute makes it as

clear as "Swedish crystal" that the training duty engaged in by Bayles does not fit the provisions of subsection (a) which deal with activities totally unrelated to training. It is equally apparent that subsection (b) is inapposite because the gubernatorial orders contemplated there are those which would be directed to an individual rather than a *unit*, as here, and the duties there described are inconsistent with *unit* training. See KRS 38.030(1). The Bayles claim to coverage must sink or float based upon the provisions of subsection (c). Sink it does since Bayles was not on "active state service" in the statutory sense at the time of the injury because he was "entitled to receive federal pay".

The threads of federal statutory law from which the cocoon of protection was spun were in effect at the time the legislature of the commonwealth extended workmen's compensation coverage to members of the Kentucky National Guard. It must be presumed that at that time the general assembly was cognizant of the federal law and this exposes their logic and equity in restricting the applicability of the Workmen's Compensation Act to those situations in which the guardsman was injured while not entitled to federal pay. The obvious intention of the legislature was to prevent "double dipping".

We need not feel sorry for Bayles for he may pursue the federal remedies heretofore outlined in such great detail, and we need not criticize the legislature for permitting a system of unconscionable dual compensation.

The judgment of the Warren Circuit Court is reversed and the cause is remanded with directions to set aside the award of the Workmen's Compensation Board and direct the Board to dismiss the claim of the appellee.

All concur.