759 A.2d 802

The ESTATE OF Andrew BURRIS, et al.

v.

The STATE of Maryland, et al.

No. 130, Sept. Term, 1999.

Court of Appeals of Maryland.

Sept. 14, 2000.

722

724

Timothy B. Hyland (Leffler & Hyland, P.C., on brief), Fairfax, VA, Philip M. Andrews (Kramon & Graham, P.A., on brief), Baltimore, for appellants.

Stephen M. Doyle, Lieutenant Colonel, Judge Advocate General's Corps Maryland Army National Guard, Baltimore; (J. Joseph Curran, Jr., Atty. Gen. and Laura C. McWeeney, Asst. Atty. Gen., on brief), Annapolis, for appellees.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

In the early morning hours of June 13, 1997, Major Andrew Burris died after being run over by a 2½ ton truck operated by Gregory Headly and his assistant driver, Submas Singh, both members of the Maryland Army National Guard (MANG). The accident occurred at Camp Blanding, Florida, where units of MANG were participating in 15 days of annual summer training. The issue before us is whether the State of Maryland is liable to the Estate and family of Major Burris, which

sued the State for negligence. The Circuit Court for Montgomery County, in granting the State's motion to dismiss or, in the alternative, for summary judgment, determined that there was no liability. We agree and shall affirm the Circuit Court's judgment.

## BACKGROUND

The training session that led to the accident required the MANG soldiers to attack a unit of the Florida Army National Guard. Members of the 82nd Airborne Division, an active duty unit of the U.S. Army of which Major Burris was a member, participated as evaluators in several of the training exercises being conducted at Camp Blanding. The accident occurred as Headly and Singh, just after midnight, were driving the truck along a dirt road en route to pick up a patrol. Major Burris had been in the roadway evaluating another exercise. Even after the soldiers involved in the other exercise moved off the road, Major Burris remained seated in the roadway. There was some evidence that he may have fallen asleep, as he made no apparent effort to move as the truck approached from his rear.

The exact speed of the truck at the moment of impact was never determined, but evidence was presented that, at some point prior to the accident, the truck was observed going between 25 and 30 miles per hour and that Camp Blanding imposed a speed limit of five miles per hour. Although the truck was proceeding in "blackout conditions," which meant that no headlights were allowed to be on, neither Headly nor Singh were wearing night vision goggles. Headly did not even have such goggles; Singh had a pair but was not wearing them. Neither soldier had received any training in the use of night vision goggles. Neither Headly nor Singh saw Major Burris in the roadway prior to the accident.

The injuries suffered by Major Burris as a result of the collision were serious. The truck ran over his midsection, crushing his pelvis and lacerating his liver, which, in turn, led to internal bleeding. Exacerbating the problem were a dread-

ful series of missteps after the accident that significantly delayed his evacuation to receive treatment. The medics, who did not arrive until 15 minutes after the accident, came in an ambulance that was not equipped with a cervical collar or litter straps, which were necessary to secure the patient who, perhaps as a result of his injuries, was physically resisting the medics; a second ambulance, also inadequately stocked, arrived five minutes later and, using supplies from both ambulances, the medics were able to secure Major Burris and transport him to the Troop Medical Clinic, some 45 minutes after he was struck. The clinic was unable to deal with his injuries, however, and, after a further series of mishaps, during which he was transported to the wrong hospital, he was eventually taken by helicopter to a proper hospital, about two hours after the collision, where he was declared dead on arrival.

The U.S. Army and MANG had somewhat different views regarding culpability for the incident. Responding to the investigation conducted by the 82nd Airborne Division, the Maryland Adjutant General determined that (1) Major Burris's death resulted most directly from "his lack of situational awareness during night vehicle maneuvers," and (2) declining resources diminished the ability of MANG to provide and train troops with respect to night vision goggles. As to the first point, the Adjutant General noted that there was no credible evidence that the MANG truck was proceeding at an excessive rate of speed at the time of the accident and that, if Major Burris had been alert, he would have heard the truck in sufficient time to remove himself from the road. As to the second, the Adjutant General stated that the MANG soldiers did not train with night vision goggles because they did not have them, and, although some were available from the Florida Army National Guard for purposes of the exercise, the MANG drivers did not use them because they had not been trained in their use. The Army took issue, at least in part, with those conclusions. It rejected both "resourcing" and lack of training as reasons for the drivers not having and using night vision goggles and, although conceding that Major Bur-

ris "may have been inattentive," it concluded that the drivers were also inattentive and were likely speeding.

In January, 1999, the Estate and widow of Major Burris filed suit against the State, the Military Department of the State, the Maryland National Guard, and the Maryland Army National Guard. Their complaint alleged negligence (1) on the part of the drivers of the truck in speeding, being sleep-deprived, and failing to use night vision goggles, and (2) on the part of the State and the Maryland National Guard in lacking sufficient supplies of night vision goggles to provide them to all members during blackout conditions, failing to provide training to the drivers in the use of night vision goggles, and failing to have in place an adequate medical evacuation plan for its exercises. The State responded with a motion to dismiss or, in the alternative, for summary judgment, in which it raised three defenses: (1) sovereign immunity, which, because the drivers were not "State personnel," was not waived by the Maryland Tort Claims Act (MTCA); (2) the complaint sought to predicate liability on "nonjusticiable military issues"; and (3) suit was barred by the doctrine of intra-military immunity. The court credited all three defenses and, for those reasons, granted the motion and dismissed the complaint.[1] Upon the plaintiffs' appeal, we granted *certiorari* on our own initiative, prior to proceedings in the Court of Special Appeals, to review the court's conclusions.

## DISCUSSION

### The National Guard

The men and women who serve as soldiers in the Maryland Army (or Air) National Guard are members of three distinct

---

1. In holding the action barred under the Maryland Tort Claims Act, the court indicated that the basis of its holding was a finding that *Major Burris* did not have the status of "State personnel." The court apparently misspoke. As we shall see later in this Opinion, the relevant inquiry is whether *Headly or Singh* were "State personnel," not whether Major Burris had that status, which clearly he did not. We are quite convinced, from the context of the court's remarks, that the error was simply in articulation, not one of substance.

organizations—the Maryland Army (or Air) National Guard (MANG), the National Guard, and the Army (or Air) National Guard of the United States.[2] Each of these entities emanates from the colonial and early Statehood Militias—the unorganized body of citizen-soldiers that, for the first part of our national history, constituted a major, though largely illusory and often unreliable, part of the nation's and the States' military defense force.

The Maryland militia dates back to the earliest days of our history. Its existence reflected, from the beginning, the fear of large standing armies and the desire to rely, as much as possible, on the general able-bodied citizenry for defense. In 1654, the Provincial Assembly directed that there be a captain and officers in every county

"to take view of Armes in Every family and that all persons from 16 yeares of age to Sixty shall be provided with Serviceable Armes & Sufficient Amunition of Powder and Shott ready upon all Occasions and that Every master of families provid Armnes & amunition as aforesaid for Every such Servant, And that the sd. Capt. so Chosen or appointed shall have power by [Commission] Granted him for the Exerciseing of such persons as Aforesd. and Imploying them for the Service of the Commonwealth."

Assembly Proceedings, Oct. 1654, 1 Archives of Maryland 347 (Md. Historical Society 1883).

On the eve of the Revolution 120 years later, the third Provincial Convention, meeting in December, 1774, resolved that all men in the Province between the ages of 16 and 50 be enrolled in militia companies. That direction was based on the asserted premise that "a well regulated militia ... is the

---

2. In 1947, when the United States Air Force was created as a separate branch of the military, the air units of the National Guard of the United States were transferred to and became a reserve component of the Air Force. As noted in *Kentucky Nat. Guard v. Bayles*, 535 S.W.2d 234, 237 (Ky.1976), the same division took place within most of the State National Guard organizations, "so that for all practical purposes there is now an air national guard and an army national guard in each state." *See* 1957 Md. Laws, ch. 404.

natural strength and only stable security of a free government," that such a militia "will relieve our mother country from any expense in our protection and defence," and that it would "obviate the pretence of a necessity for taxing us on that account, and render it unnecessary to keep any standing army (ever dangerous to liberty,) in this province." Proceedings of the Convention, Dec. 1774, 78 Archives of Maryland 8. The vain effort, of course, was to convince Parliament that the people of the province could defend themselves and that it was unnecessary for them to be burdened by English (or English-purchased) troops and by the taxes levied to pay for those troops.

When Maryland declared independence from Great Britain and adopted its first Constitution, it embodied some of those sentiments in its first (1776) Constitutional Declaration of Rights, where they remain to this day. Articles 25 and 26 (current Articles 28 and 29) provided that "a well regulated militia is the proper and natural defence of a free government" and that "standing armies are dangerous to liberty, and ought not to be raised or kept up without consent of the legislature." In Article 33 of the Constitution itself, the Governor, with the advice of his Council, was authorized to "embody the militia" and "have the direction thereof."

The militia established in 1774 served as a home guard during the Revolutionary War. It was not part of the Continental Army, which was recruited separately, and it did not leave the State. That may have been a blessing. Although it appears that George Washington favored a "well-regulated militia," envisioning a body consisting of the younger members of the community who would be properly officered and trained, he had little use for the rag-tag militias that were available to him during the Revolutionary War. *See* Frederick Bernays Wiener, *The Militia Clause of the Constitution*, 54 Harv. L.Rev. 181, 183 (1940).

The role of the militia in national affairs was a matter of some debate at the Constitutional Convention in 1787. Under the Articles of Confederation, the States were forbidden to

keep any "body of forces" in time of peace except as authorized by the United States Congress, but they were required to "keep up a well regulated and disciplined militia, sufficiently armed and accoutred." U.S. Art. of Confed., art. 6. At the Convention, the recognized need for a reliable defense force collided with the ingrained concern that the creation and maintenance of a national standing army might imperil both individual liberty and the sovereignty of the States. As was the case with most issues debated in Philadelphia in the summer and early fall of 1787, this one led to a compromise—provision for both a standing national army and continuation of the various State militias. In Article I, § 8, clauses 12, 13, and 14, of the United States Constitution, Congress was given the power to raise and support armies (limited by the condition that no appropriation for that purpose shall be for a longer term than two years), to provide and maintain a navy, and to make rules for the government and regulation of the land and naval forces. In clauses 15 and 16, it was authorized to provide for "calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," and to provide for "organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." Any standing army was to be a national one, or at least one under Congressional control. In Article I, § 10, clause 3, the States were forbidden, without the consent of Congress, to "keep Troops, or Ships of War in time of Peace."

As the Supreme Court noted in *Perpich v. Department of Defense*, 496 U.S. 334, 340–41, 110 S.Ct. 2418, 2423, 110 L.Ed.2d 312, 322 (1990), although Congress was authorized both to raise a national army and organize the militia, in the early years of the Republic, it did neither. In 1792, Congress enacted a statute that purported to establish a "Uniform Militia throughout the United States," by directing that every able-bodied male citizen between the ages of 18 and 45 equip

himself, at his own expense, with appropriate arms and appear when called to exercise or into service[3] (*see* 1 Stat. 271 (1792)), but, as the *Perpich* Court observed, that law "was virtually ignored for more than a century, during which time the militia proved to be a decidedly unreliable fighting force." *Perpich*, 496 U.S. at 341, 110 S.Ct. at 2423, 110 L.Ed.2d at 322. Wiener suggests that the law was ineffective because it was unselective: "It imposed a duty on everyone, with the result that this duty was discharged by no one." Wiener, *supra*, 54 Harv. L.Rev., at 187. Perhaps a more significant deficiency was the fact that, under the Constitution, the militias could be called into national service only to execute the laws of the Union, suppress insurrections, and repel invasions, and, accordingly, they were not available for foreign adventures. The militias were used to suppress the Whiskey Insurrection, but they could not be called into service for the 1848 Mexican War, leading Congress, under its power to raise and support armies, to authorize the organization of volunteers to serve in that war.

The militias continued to exist in the States (*see* 1793 Md. Laws, ch. 53 and 1834 Md. Laws, ch. 251, providing for the organization of the militia, consisting of all able-bodied male (later, for a time, white male) citizens between the ages of 18 and 45), but they never really served any effective role in national military affairs. Some militia units fought at the first battle of Bull Run, but, as their enlistments, under a 1795

---

**3.** The 1792 law carefully specified the arms that the militiamen were to have. It required that each male citizen "provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder horn, twenty balls suited to the bore of his rifle, and a quarter pound of powder" and directed that he "appear, so armed, accoutred, and provided, when called out to exercise, or into service...." Militia Act, ch. 33, 1 Stat. 271 (1792). Wiener observes that, in most communities, the militia mustered once a year, but that, on those occasions, "Mars was less in evidence than Bacchus." Wiener, *supra*, 54 Harv L.Rev, at 187. That law, specifying those arms, remained on the books until 1901.

Federal law, expired after three months, President Lincoln was dependent, for the balance of the Civil War, principally on national volunteers (*see* 12 Stat. 268) and, later, draftees. The militias were left behind as home guards or for sudden emergencies.

After the Civil War, according to Wiener, the militia contemplated by the 1792 Act—the composite able-bodied male citizenry—"virtually ceased to exist, and the States relied more and more upon select bodies of men, trained after a fashion and without uniform supervision, who became known as National Guards." Wiener, *supra*, 54 HARV. L.REV., at 191. The creation of a Maryland National Guard came about in 1886. In 1870, the Legislature, though continuing in effect the "Militia of this State," consisting of all able-bodied white male citizens between the ages of 18 and 45, provided for the organization of volunteer companies drawn from the militia, and it was those volunteer companies that were to be organized, officered, and armed. *See* 1870 Md. Laws, ch. 182. The 1886 law provided that "out of the volunteer uniformed organizations already existing and those hereby created, there shall be formed a body of active militia . . . to be known as the 'Maryland National Guard.' " 1886 Md. Laws, ch. 162.

The men serving in that force were to be sworn and "regularly enlisted," and when so enlisted, for a period of three years, "shall be considered in the active militia service of the State," liable "to be called into actual service at any time for the repression of disorder and for the protection of property in aid of the civil authorities and the police of the State." *Id.* Both officers and enlisted men were to take an oath to bear true allegiance to the State of Maryland and support the Constitution thereof. The Governor, as commander-in-chief, was directed to order an encampment of the units once every two years and to require the units to adopt a service uniform resembling, as nearly as possible, that of United States troops.

It was that "organized militia," or National Guard, created throughout the country in the decades following the Civil War that Congress came to regard as the Uniform Militia contem-

plated by the 1792 enactment. Although that force may have sufficed for State purposes, it increasingly was regarded as inadequate as a national military force. In 1901, President Theodore Roosevelt, stung no doubt by the refusal of even some of the organized militias to serve in the Spanish–American War (which presented the same problem as the Mexican War did 50 years earlier—the President was not empowered to call the militia to service in Cuba, Puerto Rico, or the Philippines), declared the 1792 militia law "obsolete and worthless." *Perpich*, 496 U.S. at 341 n. 10, 110 S.Ct. at 2423 n. 10, 110 L.Ed.2d at 323 n. 10. In his First Annual Message to Congress, he urged that "[t]he organization and armament of the National Guard of the several States, which are treated as militia in the appropriations by the Congress, should be made identical with those provided for the regular forces" and that "[t]he obligations and duties of the Guard in time of war should be carefully defined, and a system established by law under which the method of procedure of raising volunteer forces should be prescribed in advance." *Id.* (quoting 14 Messages and Papers of the Presidents 6672).

The National Guard, as a national entity, came into being in 1903 under the Dick Act, 32 Stat. 775, named for Congressman Charles Dick, who had fought with the Ohio Volunteer Infantry in Cuba and was chairman of the House Committee on Militia. The Act was succinctly described in *Perpich*, 496 U.S. at 342, 110 S.Ct. at 2423, 110 L.Ed.2d at 323:

"The Dick Act divided the class of able-bodied male citizens between 18 and 45 years of age into an 'organized militia' to be known as the National Guard of the several States, and the remainder of which was then described as the 'reserve militia,' and which later statutes have termed the 'unorganized militia.' The statute created a table of organization for the National Guard conforming to that of the Regular Army, and provided that federal funds and Regular Army instructors should be used to train its members."

With respect to training, the Dick Act provided for field encampments, armory drills, assignment of Regular Army

officers to duty with the National Guard, and attendance of National Guard officers at Regular Army Service Schools.

Although the Dick Act was regarded as a vast improvement, it did not resolve the Constitutional impediment against ordering National Guard units to service outside the United States. *See* 29 Op. Atty. Gen. 322, 322–27 (1912), in which U.S. Attorney General Wickersham opined that the Militia Clauses of the U.S. Constitution precluded the President from using National Guard units south of the Mexican border. Congress responded, in 1916, with the National Defense Act which, among other things, reorganized the Regular Army, provided Federal funding for National Guard encampments, armory drills, and administration, and formally made the National Guard part of the U.S. Army. As described by the *Perpich* Court:

> "In response to [Wickersham's] opinion and to the widening conflict in Europe, in 1916 Congress decided to 'federalize' the National Guard. In addition to providing for greater federal control and federal funding of the Guard, the statute required every guardsman to take a dual oath—to support the Nation as well as the States and to obey the President as well as the Governor—and authorized the President to draft members of the Guard into federal service. The statute expressly provided that the Army of the United States should include not only 'the Regular Army,' but also 'the National Guard while in the service of the United States,' and that, when drafted into federal service by the President, members of the Guard so drafted should 'from the date of their draft, stand discharged from the militia, and shall from said date be subject to' the rules and regulations governing the Regular Army."

*Perpich*, 496 U.S. at 343–44, 110 S.Ct. at 2424, 110 L.Ed.2d at 323–24 (footnotes and citation omitted).

During World War I, President Wilson exercised his authority under the 1916 Act and drafted members of the National Guard into the Regular Army. The Supreme Court upheld that authority in the *Selective Draft Law Cases*, 245 U.S. 366,

38 S.Ct. 159, 62 L.Ed. 349 (1918). As the *Perpich* Court observed, however, "[t]he draft of the individual members of the National Guard into the Army during World War I virtually destroyed the Guard as an effective organization. The draft terminated the members' status as militiamen, and the statute did not provide for a restoration of their prewar status as members of the Guard when they were mustered out of the Army." *Perpich*, 496 U.S. at 345, 110 S.Ct. at 2425, 110 L.Ed.2d at 325. That problem was remedied by a 1933 enactment (48 Stat. 153), which brought us, essentially, to where we are today. The Act constituted the National Guard as a reserve component of the United States Army, to be known as the National Guard of the United States, and thereby preserved the integrity of its units. As described by Wiener:

> "In place of the former draft into federal service, as individuals, the Guard would be *ordered* into federal service as units. Such an order could not be given unless Congress declared a national emergency and authorized the use of troops in excess of those of the Regular Army. The organization of the units existing at the date of the order was to be maintained intact, insofar as practicable. Upon being relieved from federal service, all individuals and units would revert to their National Guard status."

Wiener, *supra*, 54 HARV. L.REV., at 208.

Accordingly, as the *Perpich* Court noted, since 1933, "all persons who have enlisted in a State National Guard unit have simultaneously enlisted in the National Guard of the United States." *Perpich*, 496 U.S. at 345, 110 S.Ct. at 2425, 110 L.Ed.2d at 325. Unless and until ordered to active duty in the Army, they retain their status as members of the State National Guard. By virtue of their dual enlistment, however, when called to active duty in the military service of the United States, they are relieved of their status in the State Guard for the duration of their Federal service. *See also Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973).

Although there is a *dual enlistment,* there is, as we indicated, a *triple status.* Enlistment in a State Army or Air National Guard constitutes, as well, enlistment in the Army or Air National Guard of the United States. The National Guard, in contrast with the Army (or Air) National Guard of the United States, is a broader concept; it is, simply, the organized militia. This is manifest in title 10 U.S.C. § 311, which deals with the militia referred to in the U.S. Constitution. Section 311(a) defines, with certain exceptions, the "militia of the United States" as consisting of all able-bodied male citizens between the ages of 17 and 45 and all female citizens who are members of the National Guard. Section 311(b) divides that militia into two classes: the "organized militia," which consists of the National Guard and the Naval Militia, and the "unorganized militia," which consists of those members of the militia who are not members of the National Guard or the Naval Militia. State law makes a comparable classification. *See* Maryland Code, Article 65, § 5.

The issues in this case, at least with respect to the truck drivers, Headly and Singh, involve the relationship between MANG and the Army National Guard of the United States.

### *Liability For Conduct Of Headly And Singh*

■ The defendants in this case are the State of Maryland and units of the State Government, which we shall refer to collectively as the State. Headly and Singh were not sued individually. The action is for common law negligence, and, to the extent it is based on the conduct of Headly and Singh, the liability sought to be imposed on the State is a vicarious one— the liability of the principal for the negligent acts of its agents. The State has a common law sovereign immunity from such actions, however, except to the extent that the Legislature has waived that immunity by (1) authorizing a suit for damages, and (2) providing for the payment of any resulting judgment. *Kee v. State Highway Admin.,* 313 Md. 445, 455, 545 A.2d 1312, 1317 (1988). The only relevant statute in this case is the Maryland Tort Claims Act (MTCA), found in Maryland Code, §§ 12–101 through 12–110 of the State Government Article

and § 5–522 of the Courts and Judicial Proceedings Article. That Act "established a limited waiver of the State's immunity in certain tort actions." *Condon v. State,* 332 Md. 481, 492, 632 A.2d 753, 758 (1993). Whether the State is liable for the conduct of Headly and Singh depends on whether MTCA applies.

■ In examining MTCA, we must start with the more basic premise that, quite apart from any doctrine of sovereign immunity, vicarious liability does not exist unless the negligent conduct was committed by an employee or agent of the State. Sovereign immunity becomes important, with respect to vicarious liability, only when, under traditional agency law, the negligent actor is an agent of the State. It is then that we must look to MTCA to determine whether the State has waived its immunity as to that conduct or that actor. MTCA does not purport to waive immunity, and thus assume liability, to the full extent of the law of agency, however. Immunity from vicarious liability is waived only to the extent that the tortious conduct is committed by "State personnel"—a defined term. *See State v. Card,* 104 Md.App. 439, 447, 656 A.2d 400, 404, *cert. denied,* 339 Md. 643, 664 A.2d 886 (1995) ("There is nothing in [MTCA] itself, or in its history, suggesting an intent that the State be liable for the conduct of persons other than those included within the definition of 'State personnel.' "). Accordingly, the State's liability for the conduct of Headly and Singh depends not on whether they were agents of the State in any general sense but whether, at the time of the accident, they were "State personnel."

The term "State personnel" is defined in § 12–101(a). It includes a laundry list of officials and employees, but only two categories are relevant here—subsection (a)(1), which includes "a State employee or official who is paid in whole or in part by the Central Payroll Bureau in the Office of the Comptroller of the Treasury," and subsection (a)(4), which includes "an individual who, without compensation, exercises a part of the sovereignty of the State."

Petitioners make a number of claims, some addressing § 12–101(a), some not. Principally, they ignore the limitation put on the waiver of immunity and treat the issue as depending on whether MANG had been "federalized" or, conversely, remained in State service during the training exercise. Relying on *United States v. Hawaii*, 832 F.2d 1116 (9th Cir.1987) and *Emsley v. Army Nat'l Guard*, 106 Wash.2d 474, 722 P.2d 1299 (1986), they contend that members of a State National Guard remain State employees during training sessions and that "[t]he record here is devoid of facts as to whether [MANG] was properly federalized during its training at Camp Blanding."

The very statement of the argument exposes its fallacy. We are not concerned with whether the two actors were State employees during the training exercise, but with whether, during that exercise, they were "State personnel," and therein lies the distinction between this case and the two cited. In the Hawaii case, the plaintiffs were injured when their car was struck by a jeep driven by a sergeant in the Hawaii National Guard who, at the time, was apparently in a training exercise. The plaintiffs sued the United States and Hawaii under their respective tort claims acts. When they dismissed their action against Hawaii, the United States filed a third party claim against the State for contribution. The Government settled with the plaintiffs and then pursued its third party complaint. The driver, the court held, was a *Federal* employee at the time of the accident and was therefore individually immune from suit under the Federal Drivers' Act, 28 U.S.C. § 2679(b). Neither that fact nor the fact that the Federal Tort Claims Act made the Federal Government liable for acts or omissions of National Guard personnel during Federal training activities, the court held, precluded derivative liability on the part of Hawaii, because, as a National Guardsman, the driver was also, according to the court, under the control of the State. The case presented a host of issues not at all germane here but, for our purposes, it essentially turned on the fact that, under the Hawaii tort claims act in effect at the time of the accident, Hawaii had apparently waived sovereign immunity

for negligent acts of National Guard personnel occurring during Federal training exercises.[4] That is not the case with MTCA. Nor, we might add, is it any longer the case in Hawaii.

The Washington case is distinguishable for the same reasons. The plaintiffs were Army personnel who were killed or injured when, during a training exercise, an artillery unit of the Washington National Guard negligently fired a shell in their direction. The Washington tort claims act made the State liable for damages arising out of its tortious conduct "to the same extent as if it were a private person or corporation." *Emsley*, 722 P.2d at 1302. Unlike MTCA, it apparently did not attempt to define or limit the types of agents whose conduct would produce vicarious liability. *See also Kentucky National Guard v. Bayles*, 535 S.W.2d 234 (Ky.1976) and *Speer v. State*, 27 Ill. Ct. Cl. 188, 1971 WL 14977 (1971).

There are both Federal and State laws dealing with MANG. The Federal laws are scattered among Title 32 of the U.S.Code, dealing with the National Guard, Title 10, dealing with the Armed Forces, and Title 37, dealing with pay and allowances for the uniformed services. The State law is contained principally in Article 65 of the Maryland Code, dealing with the militia. Title 32 U.S.C. § 502 requires that, under regulations prescribed by the Secretary of the Army (or Air Force), each company, battery, squadron, and detachment of the National Guard (1) assemble for drill and instruction at least 48 times each year, and (2) participate in training at

---

**4.** With all due respect to the Ninth Circuit Court of Appeals, the *per curiam* opinion filed in the case is not terribly enlightening on this point. Neither the actual text of the Hawaii tort claims act nor a summary of it is recited. The issue addressed by the court was whether a later amendment to the act, which purported to retain sovereign immunity in such circumstances, could be applied retroactively, and the court held that it could not be so applied. It is implicit from that discussion that the act in effect at the time of the accident had, indeed, waived sovereign immunity. It appears that the Hawaii Act defined "Employees of the State" to include "members of the Hawaii national guard," without distinction as to their actual status at the time their conduct was committed. *See* HAW.REV.STAT. § 662–1.

encampments, maneuvers, outdoor target practice, or other exercises, at least 15 days each year. Those requirements are also imposed by State law. *See* Article 65, § 27.

Under Federal law, the 48 weekend drills are classified as inactive duty training (Title 10, § 101(d)(7)(A) and Title 37, § 206(a)(1)), for which the members of the National Guard are paid, by the Federal Government, "at the rate of ⅒ of the basic pay authorized for a member of a uniformed service of a corresponding grade entitled to basic pay." § 206(a). The mandatory 15 days of field training is classified as active duty training (Title 10, § 101(d)(1)), for which the members of the National Guard are paid, by the Federal Government, at the same rate applicable to their counterparts in the uniformed service who are on active duty (Title 37, § 204(a)(2)). In both instances, they are compensated entirely by the Federal Government. That is manifest not only by the Federal statutes but also by State law.

Section 8 of Article 65 authorizes the Governor to order any part of the militia into active service (1) in times of public crisis, disaster, rioting, catastrophe, insurrection, invasion, tumult, or breach of the peace, (2) upon reasonable apprehension thereof, or (3) to enforce the laws of the State. Section 8 makes clear, however, that "active State service" or "active duty," as referred to in that section, "shall not include drill periods or preparation therefor or equivalent training, or annual field training of the militia while in its capacity as National Guard of the United States, unless the Governor shall provide specifically to the contrary."

State compensation for military service is provided for in § 32 of Article 65. That section applies only when the organized militia is "ordered out for active duty or training by the Governor, or by his authority."

The evidence presented in connection with the State's motion is fully consistent with these statutory provisions. Before the court were (1) Permanent Orders 91–23 and 91–29 of the Adjutant General, under the authority of Title 32 U.S.C. § 503, ordering the units to Camp Blanding for 15 days of

training from June 7—21, 1997, (2) MANG records, under affidavit of Colonel Walter Mueller, United States Property and Fiscal Officer for MANG, showing that Headly and Singh received Federal pay for the 15 days of training, and (3) an affidavit of Edwin Greenberg, Director of the State Central Payroll Bureau, attesting that (i) members of MANG are paid from Central Payroll Bureau as State employees when called into active service by the Governor pursuant to Article 65, § 8, (ii) they are not paid from Central Payroll Bureau when called into active service under orders of the United States Government, and (iii) no members of MANG, including Headly and Singh, were called into active service of the State by the Governor or paid from Central Payroll Bureau as State employees during the month of June, 1997. No evidence contrary to those documents or raising any dispute of fact stated in those documents was presented.

Petitioners assert, however, that, because, as members of MANG, Headly and Singh may *sometimes* be paid through Central Payroll Bureau—when they are called into active service by the Governor under § 8 of Article 65—it is possible that they may be paid "in part" by that unit and, for that reason, qualify as State personnel. That is not the correct approach. For one thing, there is no evidence in this record that either Headly or Singh has *ever* been called into State service by the Governor and has, therefore, *ever* been paid through Central Payroll Bureau. More important, their status as State personnel must be determined based on whether, *at the time of the incident,* they were being paid in whole or in part through Central Payroll Bureau.

The part payment language was simply to cover persons who are, at the time of the incident giving rise to the claim, State officials or employees but who are being paid from more than one source. That circumstance is not uncommon. To view part payment in a linear context, as petitioners do, would make someone who, on a contract basis, works at scattered times for a State agency, State personnel even when he or she is not working for the State. A part-time instructor at a State

school or a person who does seasonal work for a State agency would be regarded as State personnel even when working full-time for someone else. On the record before us, it is clear that, at the time of the accident, Headly and Singh were not being paid in whole or in part by the Central Payroll Bureau.

■ Finally, petitioners attempt to classify Headly and Singh as State personnel under § 12–101(a)(4), on the theory that they were, without compensation, exercising a part of the sovereignty of the State. That, too, is unavailing. Without regard to whether they were serving "without compensation," Headly and Singh clearly were not exercising any part of the sovereignty of the State of Maryland while scrimmaging in the State of Florida as part of Federal active-duty annual field training. Accordingly, they were not State personnel, and, as a result, MTCA is not applicable. In light of this conclusion, it is not necessary for us to address the other defenses raised by the State with respect to this aspect of petitioners' claim.

### Systemic Negligence—Justiciability

■ Apart from the negligence alleged on the part of Headly and Singh, petitioners averred that MANG lacked sufficient supplies of night vision goggles to provide them to all members during blackout conditions, that MANG did not provide training in the use of night vision goggles, and that it did not have in place an adequate medical evacuation plan for its exercises. Those deficiencies, they claim, also constitute negligence on the part of MANG. Unlike the specific negligence charged to the drivers, however, this form of alleged negligence was alleged to be direct and systemic. It concerns policies and procedures.[5]

---

**5.** The complaint itself was very vague with respect to these allegations. In their answer to the State's motion for summary judgment, petitioners made clear that the negligence was, indeed, "systemic" and that it arose from decisions made by the Adjutant General "and other senior Guard members." Petitioners averred that "[t]heir collective failure to supply NVG's, provide NVG training, adequately establish and enforce a speed limit, and establish a viable medical evacuation plan, played as much of a role in Major Burris' death as the operators' misconduct."

The State raised two, somewhat overlapping, defenses to this aspect of the claim—non-justiciability and intra-military immunity. The former posits that military training and provisioning are matters committed to the Legislative and Executive Branches of the government and therefore constitute political questions that are rarely proper subjects for judicial intervention. The intra-military immunity doctrine proceeds from *Feres v. United States*, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and its progeny and appears, as currently postulated, to be based principally on the public policy notion that suits by soldiers for injuries arising out of military operations—that are "incident to military service"—are detrimental to the internal disciplinary structure and should not be allowed. More fundamentally, *Feres* bars such claims "because they are the '*type* [s] of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.'" *United States v. Johnson*, 481 U.S. 681, 690, 107 S.Ct. 2063, 2069, 95 L.Ed.2d 648, 658 (1987) (quoting *United States v. Shearer*, 473 U.S. 52, 59, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38, 45 (1985)) (emphasis in original). Courts have viewed the *Feres* doctrine as "tantamount to a limitation of subject matter jurisdiction." *Stauber v. Cline*, 837 F.2d 395, 399 (9th Cir.1988), *cert. denied*, 488 U.S. 817, 109 S.Ct. 55, 102 L.Ed.2d 33 (1988). *See also Smith v. United States*, 196 F.3d 774, 776 n. 1 (7th Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1676, 146 L.Ed.2d 485 (2000); *Fleming v. United States Postal Service*, 186 F.3d 697, 699 (6th Cir.1999); *Brown v. United States*, 151 F.3d 800, 803–04 (8th Cir.1998); *Bowen v. Oistead*, 125 F.3d 800, 803–04 (9th Cir.1997), *cert. denied*, 524 U.S. 938, 118 S.Ct. 2343, 141 L.Ed.2d 714 (1998); *Wake v. United States*, 89 F.3d 53, 57 (2d Cir.1996); *Schoemer v. United States*, 59 F.3d 26, 30 (5th Cir.1995), *cert. denied*, 516 U.S. 989, 116 S.Ct. 519, 133 L.Ed.2d 427 (1995); *Madsen v. United States ex. rel. United States Army, Corps of Engineers*, 841 F.2d 1011, 1012 (10th Cir.1987); *Del Rio v. United States*, 833 F.2d 282, 285–86 (11th Cir.1987) (treating the *Feres* doctrine as jurisdictional and regarding a motion to dismiss based on *Feres* as challenging subject matter jurisdiction).

**744**

 Both of these doctrines are well-accepted as a matter of Federal law. Not surprisingly, the State jurisprudence is more scant. The State, in this case, urges that we apply the Federal law, either on the basis of preemption or as a matter of State policy. It raises the concern that State courts have not been authorized and are really not competent to second-guess military decisions made by military personnel, including decisions regarding the equipping and training of troops, and that, if they proceed to do so, through the application of State tort law, the uniformity and integrity of the military command structure will be imperiled. Petitioners respond that the non-justiciability doctrine does not apply to an action for money damages and that *Feres* represents an act of judicial legislation that Maryland should not follow. We agree with the State that this aspect of petitioners' action is non-justiciable, and we therefore need not address the issue of intra-military immunity.[6]

 In deciding whether a claim is justiciable, the court must determine, first, "whether the claim presented and the

---

**6.** The *Feres* doctrine has been applied almost exclusively in the context of claims alleging specific negligence or other wrongful conduct on the part of named or ascertainable individuals, the liability of the Government in those instances being vicarious. It bars relief under the Federal Tort Claims Act when the claimant suffered the injury as an incident to military service and proceeds from the conclusion that, in enacting the FTCA, Congress did not intend the Act to cover that situation. *Feres* does not bar a claim under FTCA when the claimant was a civilian and was thus not injured as an incident to his or her military service. The non-justiciability doctrine addresses a different concern—one that exists regardless of the claimant's military or civilian status. It is based on the notion that certain policy issues relating to military provisioning, duty assignments, and training are ordinarily matters committed to the Legislative and Executive Branches and, at least in the absence of a Constitutional authorization by them, may not be interfered with by judges and juries. In enunciating and applying that doctrine, the Supreme Court has made clear that the military is unique in many ways, and the Court has not chosen to extend the doctrine to other Executive Branch agencies. In applying the doctrine here, in this context, we do not suggest in any way that it would also serve to shield from judicial scrutiny policy decisions made by other Executive Branch agencies, including police or other paramilitary agencies, that may trample on individual rights or otherwise create

relief sought are of the type which admit of judicial resolution," and, second, whether the structure of government "renders the issue presented a 'political question'—that is, a question which is not justiciable in federal [or State] court because of the separation of powers provided by the Constitution." *Powell v. McCormack,* 395 U.S. 486, 516–17, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491, 514 (1969); *Lamb v. Hammond,* 308 Md. 286, 293, 518 A.2d 1057, 1060 (1987). In judging the first element, the court must determine "whether the 'duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded.' " *Powell,* 395 U.S. at 517, 89 S.Ct. at 1961, 23 L.Ed.2d at 514 (quoting *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663, 674 (1962)); *see also Lamb,* 308 Md. at 293, 518 A.2d at 1060. The second element, taken from *Baker v. Carr,* 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686, involves whether there is

"a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*See Powell,* 395 U.S. at 518, 89 S.Ct. at 1962, 23 L.Ed.2d at 515; *Lamb,* 308 Md. at 293–94, 518 A.2d at 1060.

The Supreme Court first applied the justiciability doctrine in the context of a military decision in *Orloff v. Willoughby,*

---

cognizable causes of action. *See generally United States v. Muniz,* 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (*Feres* not a barrier to negligence suit by federal prisoners for injuries suffered while in prison).

345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953). A physician had been drafted into the Army under a law specifically allowing the drafting of physicians, but, because of some lingering loyalty concerns, he was not commissioned as an officer, as most physicians were, and was not immediately assigned medical duties. He filed an action for Federal habeas corpus to require the Army either to commission him as an officer and assign him medical duties or to discharge him. Although the case was arguably moot by the time it reached the Supreme Court, the Court chose to address the justiciability issue raised by the Government.

The Court concluded that the Judiciary had no authority to order that Orloff be commissioned, that he be assigned to medical duties, or that he be discharged. The power and duty to commission officers was vested by Congress in the President, and, "[w]hatever control courts have exerted over tenure or compensation under an appointment, they have never assumed by any process to control the appointing power either in civilian or military positions." *Id.* at 90, 73 S.Ct. at 538, 97 L.Ed. at 848. With respect to duty assignment, the Court acknowledged that the Army may, in some instances, be guilty of "discrimination, favoritism or other objectionable handling of men," but concluded that "judges are not given the task of running the Army." *Id.* at 93, 73 S.Ct. at 540, 97 L.Ed. at 849. The Court continued:

"The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters. While the courts have found occasion to determine whether one has been lawfully inducted and is therefore within the jurisdiction of the Army and subject to its orders, we have found no case where this Court has assumed to revise duty orders as to one lawfully in the service."

*Id.* at 94, 73 S.Ct. at 540, 97 L.Ed. at 849.

With respect to Orloff's alternative request for discharge, the Court, in the same vein, concluded that, because he was

not held in the Army unlawfully and the Court "cannot go into the discriminatory character of his orders," there was no basis for ordering his discharge. *Id.* at 94, 73 S.Ct. at 540, 97 L.Ed. at 850.

The Supreme Court returned to this issue in *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973). In the aftermath of the tragic confrontation between students at Kent State University and the Ohio National Guard, students at Kent State sued to restrain the Governor of Ohio from prematurely ordering National Guard troops to duty in civil disorders and to restrain leaders of the National Guard from future violations of the students' Constitutional rights. At issue at the Supreme Court level was an order of the Sixth Circuit Court of Appeals remanding the case for a factual determination of whether there was a pattern of training, weaponry, and orders in the Ohio National Guard that made inevitable the unnecessary use of fatal force in suppressing civilian disorders.

The Court noted that the case was not one in which damages were sought for the injuries sustained in the earlier confrontation or in which an injunction was sought to restrain specified and imminently threatened unlawful action, but rather was a request for "a judicial evaluation of the appropriateness of the 'training, weaponry and orders' of the Ohio National Guard." *Id.* at 5–6, 93 S.Ct. at 2443, 37 L.Ed.2d at 413. Noting that the Guard was "an essential reserve component of the Armed Forces of the United States, available with regular forces in time of war," the Court declared that the kind of intervention sought by the students would "embrace critical areas of responsibility vested by the Constitution in the Legislative and Executive Branches of the Government." *Id.* at 7, 93 S.Ct. at 2444, 37 L.Ed.2d at 413–14. It explained:

"It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less compe-

tence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and control of military force by elected representatives and officials which underlies our entire constitutional system...."

*Id.* at 10, 93 S.Ct. at 2446, 37 L.Ed.2d at 415–16.

The Court ended its Opinion with the caveat that "we neither hold nor imply that the conduct of the National Guard is always beyond judicial review or that there may not be accountability in a judicial forum for violations of law or for specific unlawful conduct by military personnel, whether by way of damages or injunctive relief," but only that those kinds of questions were not presented in the case before it. *Id.* at 11–12, 93 S.Ct. at 2446–47, 37 L.Ed.2d at 416.

The Court applied the language, and the doctrine, from *Orloff* and *Gilligan* in *Chappell v. Wallace*, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). *Chappell* was an action by several enlisted men aboard a naval vessel against their superior officers for declaratory and injunctive relief and money damages, alleging that the defendants failed to assign them desirable duties, gave them low performance evaluations, and imposed unusually severe penalties because of their minority race. In holding that their claim was not justiciable, the Court recounted from *Orloff* that judges are not given the task of running the Army (or Navy), and confirmed the holding of *Gilligan* that Congress's power over the militia "would be impermissibly compromised by a suit seeking to have a Federal District Court examine the 'pattern of training, weaponry and orders' of a State's National Guard." *Id.* at 301–02, 103 S.Ct. at 2366, 76 L.Ed.2d at 592. Once again recognizing the unique role of the military and the fact that "perhaps in no other area has the Court accorded Congress greater deference," *id.* at 301, 103 S.Ct. at 2366, 76 L.Ed.2d at

591 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 64–65, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478, 486 (1981)), the Court refused to apply to military personnel its holding in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), that damages could be awarded for Constitutional violations committed by Federal employees.

■ Petitioners' contention that this doctrine does not apply to suits for money damages is inaccurate. As noted, *Chappell* involved a claim for money damages. So did *Tiffany v. United States*, 931 F.2d 271 (4th Cir.1991), *cert. denied*, 502 U.S. 1030, 112 S.Ct. 867, 116 L.Ed.2d 773 (1992) and *Aktepe v. United States*, 105 F.3d 1400 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). *Tiffany* arose from a mid-air collision between a private aircraft and an Air Force interceptor that was detached to investigate the private craft's intrusion into an air defense identification zone. As a result of the collision, the private craft crashed into the sea with total loss of life. The estates of the pilot and some of the passengers, claiming negligence on the part of the Air Force, sued for damages. Holding the claims non-justiciable, the court noted that "[t]he decisions whether and under what circumstance to employ military force are constitutionally reserved for the executive and legislative branches." *Tiffany*, 931 F.2d at 277.

*Aktepe* arose out of a NATO naval exercise, during which the crew on a U.S. aircraft carrier launched two armed missiles at a participating Turkish ship. Three hundred Turkish sailors injured in the ensuing explosion, claiming negligence, sued the United States for money damages. Holding the claims non-justiciable, the court noted that "[t]he Supreme Court has generally declined to reach the merits of cases requiring review of military decisions, particularly when those cases challenged the institutional functioning of the military in areas such as personnel, discipline, and training." *Aktepe*, 105 F.3d at 1403. Citing *Gilligan*, the court further observed that "the Constitution reserves to the legislative and executive branches responsibility for developing military training proce-

dures that will ensure the combat effectiveness of our fighting forces." *Id.*

The framework that spawned the justiciability doctrine at the Federal level operates as well at the State level. Comparable to the Federal Constitutional assignment to Congress of the power to raise and support armies, make rules for the government and regulation of the land and naval forces, and provide for the organizing, arming, and disciplining of the militia, Article IX, § 1 of the Maryland Constitution provides that "[t]he General Assembly shall make, from time to time, such provision for organizing, equipping and disciplining the Militia, as the exigency may require, and pass such Laws to promote Volunteer Militia organizations as may afford them effectual encouragement." Executive authority over the militia is provided for in Article II, § 8 of the Constitution, which makes the Governor the commander-in-chief of the land and naval forces of the State and authorizes him or her to call out the militia to repel invasions, suppress insurrections, and enforce the execution of the laws.

The General Assembly has exercised its authority under Article IX and enacted comprehensive laws, codified in Article 65 of the Code, governing the militia. In § 10, it has placed the Adjutant General "in control of the Military Department of the State, and subordinate only to the Governor in matters pertaining to said department." Section 12 provides that the general appropriations for the militia shall be applied exclusively to the expenses of the office of the Adjutant General "and to the maintenance and equipment and for the general efficiency of the organized militia of this State" and specifies that "[n]o purchases shall be made, debts incurred or money expended except by the direct authority of the Adjutant General." Section 14 complements that authority by prohibiting any officer of the militia from incurring "any expense whatever to be paid by the State, except such as authorized in this article, without first obtaining the authority of the Adjutant General."

This Constitutional and statutory structure places responsibility for the training and equipping of MANG and its personnel squarely and exclusively with the Legislative and Executive branches of the State government. Although, as the Supreme Court made clear in *Gilligan*, that placement does not withdraw *all* conduct by MANG and its personnel from judicial scrutiny, it certainly does place significant limits on that scrutiny, especially in the absence of any legislation clearly authorizing judicial scrutiny. For purposes of this case, it will suffice to hold that it is not within the province of the Judiciary, whether through actions for declaratory or injunctive relief or through actions for money damages, to determine how many night vision goggles should have been purchased, or who should have received them, or what kind of training MANG troops should have had with respect to them, or how medical evacuation teams should have been organized and equipped. Harking back to some of the basic elements of the justiciability doctrine enunciated in *Powell* and *Lamb*, there is, in regard to the issues before us, not only "a textually demonstrable constitutional commitment of [those issues] to a coordinate political department" but a lack of judicially discoverable and manageable standards for resolving them "without expressing lack of the respect due coordinate branches of government." *Powell*, 395 U.S. at 518, 89 S.Ct. at 1962, 23 L.Ed.2d at 515 (quoting *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed.2d at 686); *see also Lamb*, 308 Md. at 293, 518 A.2d at 1060.

Common law negligence is founded upon the existence of a duty and the breach of that duty. To resolve this aspect of petitioners' claim, a judge or jury would be required to determine whether MANG was negligent in not utilizing its available resources to obtain a sufficient number of night vision goggles, or in not properly allocating among its troops the goggles it had, or in failing to train Headly and Singh in the use of such goggles, or in assigning the untrained Headly and Singh to night maneuvers, or in not having a more effective medical evacuation plan. To make those determinations, however, the judge or jury would, or might, have to

decide how many night vision goggles should have been acquired, what priority their acquisition had over other equipment or resources needed by MANG, how the goggles should have been allocated, how much and what kind of training should have been provided and when it should have been provided, whether military personnel who have not been adequately trained (adequate in the minds of the judge or jurors) can properly be assigned to night maneuvers and, if so, in what circumstances, and what kind of medical evacuation plan and facilities should have been available. Apart from the questionable competence of a lay judge or jury to determine those issues, any attempt to determine them would constitute a substantial interference with the authority and discretion vested in the other two branches of government.[7]

JUDGMENT OF CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED, WITH COSTS.

---

7. Keeping in mind that State National Guard units also comprise the National Guard of the United States, which is a critical component of the United States Army, one can only imagine the problems that would arise if a Maryland jury were to decide these issues one way, an Ohio jury another way, and an Alabama jury a third way.