Stephen R. BEILGARD, Appellant,

v.

STATE of Alaska, Appellee.

No. S–5729.

Supreme Court of Alaska.

June 2, 1995.

Rehearing Denied June 22, 1995.

A. Lee Petersen, Law Offices of A. Lee Petersen, P.C., Anchorage, for appellant.

Raymond M. Funk, Asst. Atty. Gen., Fairbanks, Bruce M. Botelho, Atty. Gen., Juneau, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

An Alaska state trooper arrested Stephen Beilgard on May 16, 1991, pursuant to an arrest warrant issued on a complaint charging Beilgard with five counts of state game violations. Beilgard pled no contest to two counts, and the State dismissed the remaining three counts. Beilgard later sued the State of Alaska, alleging that it negligently caused his arrest and subsequent loss of business. On appeal, Beilgard claims that the superior court erred in granting summary judgment to the State and dismissing his complaint.

This case turns on questions of public policy. We affirm.

## II. FACTS AND PROCEEDINGS

Beilgard is a resident of Wyoming, where he conducts a hunting and guiding business. In early 1991 he and his partner, Bill Depuy, decided to offer their customers a self-guided fishing and black bear hunting trip to Alaska. Beilgard alleges that he wrote to the Alaska Department of Fish and Game (ADF & G) on January 24, concerning his intended plans, and requested information about applicable state laws.[1] Beilgard maintains that the State did not respond to his inquiry until early April, when it sent him application forms for an "Alaska Business License," a "Transporter License," and a "Commercial Use Permit," without explanation.

On April 2 Beilgard telephoned Shaleen Harrison at the Juneau office of ADF & G; she informed him of the bear hunting season and the cost of fish and game licenses. Harrison also informed Beilgard that, without a license, he could neither guide nor accompany hunters while they hunted. Beilgard sent the State his completed applications for a business license, transporter license, and commercial use permit on April 10. The State received his applications on April 16.

On May 3 state licensing examiner Kurt West, of the Big Game Commercial Services Board, wrote to Beilgard. He informed Beilgard that because Beilgard had represented on his transporter license application that Gulf Air of Yakutat would be transporting Beilgard's clients, Gulf Air needed to obtain the transporter license. West also informed Beilgard that he needed to obtain a "Commercial Use Permit Holder License" which would allow him to rent gear and book hunts, but not to accompany hunters in the field. Finally, West asked Beilgard to clarify his intentions. On May 6 Beilgard mailed West a letter describing his intended activities and requesting clarification as to what was legal and illegal and what licenses he needed to obtain.

On May 10, the day he received Beilgard's May 6 letter, West replied with a letter stating:

> In our last correspondence we ruled out your application for a transporter license because Gulf Air in Yakutat would be flying the hunters from Yakutat. If you choose to pursue the commercial use permit holder license you are not permitted to go into the field with the hunters nor are you permitted to set up and take down camps for them. The commercial use permit license allows you to act as a hunt broker and rent gear to hunters, however, under AS 08.54.460, you may provide accommodations in the field at a permanent lodge, house, or cabin only. Setting up

1. Beilgard claims his January 24, 1991 letter stated:

   I need some help with law definitions, and an opinion of what is legal to do and what is not. Please read on, and advise.

   I intend to supply a tent, food, camp, equipment, and boat transportation for a small group of hunters in the spring of 1991. Their pursuit is Black Bear. I will not be in the camp with them, but will check on them from day to day. They will be hunting alone, totally un-guided. While I will recommend certain camp spots, they will be welcome to be dropped off at any point they choose. We may even be chartering a plane to get them where they want to hunt. In short, a typical drop camp situation where I supply the area expertise and equipment, for a fee.

   The questions are these: 1. Am I legal to do this? I AM NOT an Alaskan big game guide or outfitter at this point. I do outfit fishing trips. 2. Do I need any licenses, and if so, where and how can I get same? I am insured. 3. Is there anything else that you can think of that I should be aware of prior to showing folks where to hunt for Black Bear?

tent camps or spike camps is not permitted. At this point, the only services I believe that you can offer under a commercial use permit [are] to rent gear and offer your advice to hunters. You may not accompany them in the field or provide any type of guide-outfitting services. I have enclosed a copy of the statute for your review. If you still wish to pursue a commercial use permit holder license, please describe your services and I will apply $130 of the $280 already submitted towards that license and refund the balance to you.

West enclosed a pamphlet entitled "Statutes and Regulations—Big Game Commercial Services Board." [2]

Beilgard, however, did not wait for a response to his May 6 letter. Instead, he and Depuy proceeded with the hunting trip as planned; they had already solicited and received money from several customers.[3] Beilgard and Depuy left Wyoming May 8 and arrived in Yakutat May 9. Their clients arrived May 10. Beilgard made no further attempts to communicate with the State before the hunt began. Beilgard knew he did not possess a transporter license or commercial use permit, but he planned "to hire somebody with the proper licenses." Beilgard later explained:

> Because of this, we negotiated an agreement with Dean Taylor, d/b/a Harlequin Lodge, Yakutat, under which he became the transporter and the commercial user with respect to the group who were to hunt black bear. We traded Mr. Taylor our camping outfit and made payments amounting to more than $1,500, and he agreed to fulfill our obligations to the hunters with respect to transportation and

commercial use. Mr. Taylor did have a Transporter Permit and a Commercial Use Permit. Thereafter, I and Mr. DePuy merely worked for Mr. Taylor, who was the transporter and commercial user.

Beilgard had apparently contacted Dean Taylor before May to request Taylor's services. Taylor had then informed the Alaska State Troopers he believed Beilgard planned to engage in illegal activity in Yakutat in May. Trooper Al Cain was assigned to investigate.

On May 10 Taylor, State Trooper Gerry Shanahan, who was posing as a representative of Taylor, Beilgard, and one of Beilgard's clients, proceeded to a camp site on Knight Island. All four helped set up the camp. On May 10 and 11 Taylor transported three of Beilgard's clients to the camp. On May 15 Beilgard transported two of the clients, both of whom were paying guests, from the camp back to Yakutat. On May 16 Taylor transported Shanahan and the two remaining guests back to Yakutat.

Upon his return to Yakutat, Trooper Shanahan informed Trooper Cain that Beilgard had transported some of the paying guests on a skiff to hunt for bear and later transported them back to Yakutat. Shanahan also told Cain that Beilgard had offered to trade Shanahan a Wyoming hunt for use of Shanahan's brown bear tag. Trooper Cain then prepared a five count complaint against Beilgard and obtained a warrant for his arrest.[4]

On May 16 Beilgard was arrested pursuant to the warrant in front of his guests and clients. On August 29 Beilgard pled no contest to counts one and two, guiding without a

---

2. Beilgard did not respond to West's May 10 inquiry until May 23, well after the events occurred upon which Beilgard's tort action is based. Beilgard's May 23 letter to West stated:
   As per your letter of May 10, please issue the Commercial Use Permit so that I can offer to rent gear and give advice to hunters, as well as to broker trips, as per AS 08.54.460. I understand that you will apply $130.00 of the previously sent $280.00 and refund the difference. Thank you.

3. Beilgard solicited customers for this trip by telephone and mail. Several customers asserted

that they each paid $1,950 to Beilgard for this outfitted combination bear hunt/fishing trip. Beilgard's services were to include setting up a bear hunting camp near Yakutat. The camp was to include tents, food, cots, cooking equipment and bear bait.

4. Beilgard was charged with (1) guiding without a license; (2) transporting without a license; (3) providing commercial services without a permit; (4) representing himself to be a guide/outfitter; and (5) soliciting a loan or transfer of a brown bear tag.

license and transporting without a license; the State dismissed the other three charges.

Beilgard thereafter filed a complaint against the State and others, alleging negligence. He later moved to amend his complaint, asserting four theories against the State: (1) it negligently failed to answer Beilgard's routine inquiries about fish and game licensing within a reasonable time (Count I); (2) it negligently failed to process and issue Beilgard's commercial use permit and transporter license (Count II); (3) it negligently failed to keep adequate records containing prior correspondence with Beilgard (Count III); and (4) it negligently failed to adequately train and supervise state agents and employees (Count IV). Beilgard claimed that the State's breach of those duties led to his arrest in front of important clients and influential people in his industry and thus caused him to lose business. The State opposed the motion to amend. The court allowed Beilgard to file the amended complaint as to Count II only and dismissed Counts I, III, and IV of the amended complaint with prejudice. The court then granted summary judgment to the State on the remaining claim and issued a final judgment. Beilgard appeals the partial denial of his motion to amend and the grant of summary judgment in favor of the State on the remaining count.

## III. DISCUSSION

Beilgard argues that the superior court erred in rejecting his proposed amendments and granting summary judgment to the State. He asserts that under Alaska law, he alleged triable claims because the State owed him duties of care and breached those duties, causing him damage. His underlying theory is that if the State had not dealt negligently with his inquiries and license applications, he would not have violated Alaska's game laws, would not have been arrested, and would not have been damaged. He also theorizes that Taylor was an agent of the State, and that the State is liable for Taylor's tortious conduct and for failing to supervise Taylor.

The State argues in response that it owed Beilgard no duty of care, that it breached no duty to him, that it did not proximately cause Beilgard damage because he was properly arrested, and that it is entitled to statutory immunity. At oral argument, counsel for the State also argued that, as a matter of public policy, a convicted criminal should not be allowed to impose tort liability on others for his criminal acts.

### A. Standard of Review

■ The superior court considered matters outside the pleadings when it entered orders rejecting some counts or proposed counts for failure to state a claim upon which relief could be granted and dismissing the remaining count on summary judgment. We consequently review both orders as if they granted summary judgment. Alaska R.Civ.P. 12(b); *Shooshanian v. Wagner*, 672 P.2d 455, 460 (Alaska 1983).

■ When reviewing a grant of summary judgment, we must "determine whether any genuine issue of material fact exists and whether the moving party is entitled to judgment on the law applicable to the established facts." *R.E. v. State*, 878 P.2d 1341, 1345 (Alaska 1994); *Brock v. Alaska Int'l Indus., Inc.*, 645 P.2d 188, 190 n. 6 (Alaska 1982); *see also* Alaska R.Civ.P. 56(c). In determining whether summary judgment was warranted, we review the matter *de novo*, and view the facts presented in the light most favorable to the non-moving party. *Farmer v. State*, 788 P.2d 43, 46 n. 8 (Alaska 1990); *Kollodge v. State*, 757 P.2d 1028, 1032 (Alaska 1988).

### B. Effect of Beilgard's Guilt

We first consider the effect of Beilgard's guilt on his claim that the arrest caused him to suffer damages. Beilgard argues that it was error to enter the orders disposing of his claims and proposed claims because there were genuine issues of material fact concerning the State's alleged negligent acts leading to the arrest. The State raises numerous theories to support affirmance. Because it is dispositive, we consider only the public policy issue.

■ We have consistently recognized that public policy precludes a criminal defendant convicted of a crime from imposing

liability on others for the consequences of his own antisocial conduct. *Shaw v. State, Dept. of Admin.*, 861 P.2d 566, 571–72 (Alaska 1993) (*Shaw II* ) (concerning convicted criminal's malpractice suit against his former criminal defense attorney); *Lord v. Fogcutter Bar*, 813 P.2d 660, 663 (Alaska 1991) (holding dram shop statute did not protect bar patron from the consequences of his own intentional, criminal misconduct); *Adkinson v. Rossi Arms Co.*, 659 P.2d 1236, 1240 (Alaska 1983) (barring suit against shotgun manufacturer by assailant for damages resulting from his manslaughter conviction).[5] In *Shaw II* we stated: "As we did in *Adkinson* and *Lord,* we hold that if plaintiffs engaged in the criminal conduct they are accused of, then they alone should bear full responsibility for the consequences of their acts, including imprisonment." *Shaw II*, 861 P.2d at 572.[6]

Beilgard failed to establish any genuine fact dispute about his guilt on the five counts on which he was charged, including the two counts to which he pled no contest

and on which he was sentenced.[7] Public policy consequently bars his claims against the State.

### C. *Other Issues*

Our conclusion that Beilgard's lawsuit is barred by public policy makes it unnecessary to consider other contentions of the parties, including numerous other theories potentially supporting affirmance.[8]

### IV. CONCLUSION

For these reasons, we AFFIRM the superior court judgment dismissing Beilgard's claims against the State.

---

5.  Lord sued the Fogcutter Bar on the theory the bar was criminally negligent for serving him alcoholic beverages while he was intoxicated, causing him to suffer damages when he was later prosecuted for felonies he committed while intoxicated. *Lord*, 813 P.2d at 663.

    Adkinson sued Rossi on the theory Rossi manufactured a defective shotgun which discharged, causing Butts' death, when Adkinson pointed the shotgun at Butts. Following trial, Adkinson was convicted of manslaughter. His conviction was upheld on appeal. Adkinson claimed Rossi was liable for Adkinson's damages resulting from his manslaughter conviction. *Adkinson*, 659 P.2d at 1237.

    In both *Lord* and *Adkinson*, we affirmed summary judgments entered for the civil defendants. The defendants' alleged conduct in those cases preceded the plaintiffs' criminal acts. In *Shaw II*, Shaw's alleged criminal acts preceded his defense attorney's alleged malpractice. Shaw moved successfully for post-conviction relief. *Shaw II*, 861 P.2d at 572.

6.  AS 09.17.030, enacted in 1986, prohibits a convicted felon from suing for personal damages resulting from the commission of the felony for which he or she was convicted. The statute encompasses convictions arising from pleas of no contest. While the statute does not apply to Beilgard because he was not charged with a felony, it nonetheless "embodies the public policy justification we articulated in *Adkinson*." *Lord*, 813 P.2d at 663.

7.  There is no genuine dispute about Beilgard's guilt, at least as to the two charges to which he

pled no contest. Shortly after his arrest, Beilgard admitted to an interviewing trooper facts establishing his guilt. He pled no contest to two of the counts. He never attempted to set aside his conviction by appealing or moving for post-conviction relief. He did not allege his innocence in his complaint or proposed amended complaint. In listing genuine, material fact disputes in opposition to the State's motion for summary judgment, he raised no genuine dispute about his guilt on any count. He tacitly recognizes his guilt when he argues that if the State had not been negligent, his acts would have been lawful.

8.  We consequently need not decide whether the State owed Beilgard a duty of care, whether AS 09.50.250 provides immunity on claims which arguably implicate discretionary functions or are based on theories of misrepresentation or false arrest, whether AS 08.02.020 applies, and whether Beilgard failed to exhaust administrative remedies.

    Beilgard seems to suggest that the State's pre-arrest conduct was akin to entrapment. Beilgard did not formally claim entrapment in the superior court or on appeal, and did not raise entrapment as a defense in the criminal case. He has consequently waived any possible claim based on an entrapment theory. *Schmidt v. Beeson Plumbing & Heating, Inc.*, 869 P.2d 1170, 1177 n. 10 (Alaska 1994). We also note that the record contains no evidence supporting a claim that the State entrapped Beilgard.