ESTATE OF Kenneth W. HIMSEL, Deceased, Brought by Dr. B. Carls Kerkhove, Personal Representative of the Estate of Kenneth W. Himsel; Deborah Ann Himsel, Individually and in the Capacity as Parent of Krista S. Himsel and Kendra J. Himsel; Estate of Richard E. Brink, Deceased, Brought by Zita Rosa Brink, Personal Representative of the Estate of Richard E. Brink; Zita Rosa Brink, Individually; Boris Brink, Individually; Estate of Wilfried E. Wood, Deceased, Brought by Crystal M. Wood, Personal Representative of the Estate of Wilfried E. Wood; Crystal M. Wood, Individually and in the Capacity as Parent of Kirsten A. Wood; Estate of Michael Joseph Schmidt, Deceased, Brought by Deanna Sue Schmidt, Personal Representative of the Estate of Michael Joseph Schmidt; Deanna Sue Schmidt, Individually and in her Capacity as Parent of Preston R. Schmidt and Garret M. Schmidt; Estate of Llewellyn Archie Kahklen, Brought by Ida Marie Kahklen, Personal Representative of the Estate of Llewellyn Archie Kahklen; Ida Marie Kahklen, Individually and in her Capacity as Parent of Kristen Kahklen and Marcos Figueroa Kahklen, Appellants,

v.

STATE of Alaska, Appellee.

No. S–8640.

Supreme Court of Alaska.

Nov. 30, 2001.

Rehearing Denied Dec. 24, 2001.

36

⚷301(4)

Robert Merle Cowan, Law Offices of Cowan & Gerry, Kenai, for Appellants Himsel, Brink, and Wood; Steven E. Aldous and Tom H. Davis, Slack & Davis, Austin, TX, for Appellants Himsel, Brink, and Wood; and Kermit E. Barker, Jr., Barker & Hellén, Anchorage, for Appellants Schmidt and Kahklen.

Gary M. Guarino, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

CARPENETI, Justice.

## I. *INTRODUCTION*

In November 1992 an Alaska Army National Guard plane crashed; all aboard perished. Family members of the passengers sued the State of Alaska, alleging pilot negligence. The superior court granted summary judgment in favor of the state on the grounds that the claims were related to military service. We reverse and remand this case because the families' claims are not barred merely because they arose incident to military service and because there exist genuine issues of material fact relating to whether the pilot was acting on behalf of the state as a borrowed employee.

## II. *FACTS AND PROCEEDINGS*

On November 12, 1992, an Alaska Army National Guard C–12 airplane carrying eight Army National Guard members crashed into a mountain while approaching the Juneau airport, killing all persons aboard. The plane was piloted by State Aviation Officer Colonel Thomas Clark and co-piloted by Warrant Officer John Pospisil. The passengers were Major General Kenneth Himsel, General Thomas Carroll, Colonel Wilfried Wood, Sergeant Major Llewellyn Kahklen, Sergeant First Class Richard Brink, and Sergeant Michael Schmidt.

General Himsel and the other passengers were flying from Anchorage to Juneau to review facilities, personnel, and training procedures at the Juneau Battalion headquarters.

At the time of the crash, Colonel Clark was employed as a National Guard "technician" and was the "State Aviation Officer." General Himsel was executing orders from the Indiana National Guard and was on "Active Duty Special Work" status. General Thomas Carroll was the Commander of the Alaska Army National Guard. Colonel Wilfried Wood, Sergeant Major Llewellyn Kahklen, Sergeant First Class Richard Brink, and Sergeant Michael Schmidt were on Active Guard Reserve status.

The families of General Himsel, Colonel Wood, Sergeant Major Kahklen, Sergeant Brink, and Sergeant Schmidt (collectively, the families) filed suit against the State of Alaska and Beech Aircraft in state court. The families claimed that the crash was caused by "design induced pilot error." Further, the families contended that the state, as Colonel Clark's employer, was vicariously liable for his negligence under the doctrine of *respondeat superior.*

Beech Aircraft filed a third-party complaint against the estates of Colonel Clark and Warrant Officer Pospisil seeking equitable apportionment of fault.

The United States intervened to remove the case to United States District Court on the grounds that Colonel Clark was a federal employee and that the Federal Tort Claims Act [1] (FTCA) was the exclusive remedy for claims against federal employees acting within the scope of their employment. The United States further requested that the claims asserted against Colonel Clark's estate be "deemed an action against the United States." Additionally, the United States Department of Justice certified that Colonel Clark "was acting within the scope of his employment as an employee of the United States at the time of the November 12, 1992, crash of the C–12 aircraft near Juneau, Alaska."

Concurrent with the removal action, the United States filed motions to dismiss and for summary judgment. In support of its motions, the United States cited the *Feres* [2] doctrine, which bars armed service members from suing the United States under the FTCA for injuries that arose out of activities that were incident to service.[3] The case was removed to federal court.

The families voluntarily dismissed their claims against Beech Aircraft and the estates of Colonel Clark and Warrant Officer Pospi-

---

1. 28 U.S.C.A. §§ 1346(b)(1), 2671–2680 (West 1994 & Supp.1999).

2. *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

3. *See id.* at 146, 71 S.Ct. 153.

sil. The only remaining defendant was the State of Alaska. Since no federal issues remained, the case was remanded to the state superior court.

The state sought summary judgment on the grounds that the *Feres* doctrine bars all intra-military tort claims, including those between Army National Guard members in Alaska. Alternatively, the state argued that Colonel Clark was a federal employee and thus the state could not be liable under a vicarious liability/*respondeat superior* theory claim of negligence.

The superior court granted summary judgment and held that the families' claims were indeed "barred by the *Feres* doctrine." Additionally, the court held that since the families' claims were barred, it need not rule on whether the state could be liable to the families on the vicarious liability/*respondeat superior* theory.

### III. *STANDARD OF REVIEW*

We review summary judgments *de novo* to determine whether any genuine issues of material fact exist and whether the moving party is entitled to a judgment as a matter of law.[4] On questions of law, we apply our independent judgment and adopt the rule of law "most persuasive in light of precedent, reason, and policy."[5]

### IV. *DISCUSSION*

A. *The Families' Claims Against the State Are Not Barred by the Feres Doctrine.*

1. *The Feres Doctrine*

In *Feres v. United States*, the United States Supreme Court held that service members cannot bring tort suits against the federal government for injuries that "arise out of or are in the course of activity incident to service."[6] The Court reached this conclusion in spite of the fact that under the FTCA the federal government had generally waived its sovereign immunity. The FTCA rendered the federal government liable for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment."[7]

The Court has explained that the *Feres* doctrine is premised upon the concern for the "peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty."[8]

While thus limited at its inception, the *Feres* doctrine has been expanded to preclude a great variety of suits in federal court over the years. (1) It has been held to bar a negligence suit against the United States brought by the mother of a soldier who was murdered by another soldier while the victim was off-base and off-duty;[9] (2) an indemnification suit against the United States brought by a military subcontractor regarding a negligently manufactured aircraft ejection seat;[10] and (3) a suit against the United States brought by the widow of a Coast Guard helicopter pilot, which alleged that civilian Federal Aviation Administration employees negligently caused the pilot's helicopter crash.[11]

And while it has expanded in application, the *Feres* doctrine has been supported by a

---

4. See *T.P.D. v. A.C.D.*, 981 P.2d 116, 118 (Alaska 1999) (citing *Beilgard v. State*, 896 P.2d 230, 233 (Alaska 1995)).

5. *Id.* at 119 (citing *Great Am. Ins. Co. v. Bar Club, Inc.*, 921 P.2d 626, 627 (Alaska 1996)).

6. 340 U.S. 135, 146, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

7. 28 U.S.C.A. § 1346(b)(1) (West Supp.1999).

8. *United States v. Brown*, 348 U.S. 110, 112, 75 S.Ct. 141, 99 L.Ed. 139 (1954).

9. See *United States v. Shearer*, 473 U.S. 52, 57–59, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985).

10. See *Stencel Aero Eng'g Corp. v. United States*, 431 U.S. 666, 673–74, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977).

11. See *United States v. Johnson*, 481 U.S. 681, 683, 691–92, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987).

dwindling number of the members of the Supreme Court. Justice Scalia, dissenting in *Johnson* and speaking for a four-member minority, noted that the FTCA does not, on its face, generally preclude suits by military personnel.[12] Moreover, he argued that the plain language of the FTCA rendered the United States "liable to *all* persons, including servicemen, injured by the negligence of Government employees."[13] Addressing the government's argument that the *Feres* doctrine was needed to maintain military discipline and morale, Justice Scalia ironically noted that barring recovery in tort by military personnel "might adversely affect military discipline. After all, the morale of [Johnson's] comrades-in-arms will not likely be boosted by news that his widow and children will receive only a fraction of the amount they might have recovered had he been piloting a commercial helicopter at the time of his death."[14] The *Feres* doctrine has also been heavily criticized[15] and only reluctantly applied[16] in the federal circuit courts.

### 2. *Alaska law*

We have never directly ruled on the applicability of the *Feres* doctrine in Alaska.[17] With regard to tort liability, the basic policy of law in Alaska is that "when there is negligence, the rule is liability, immunity is the exception."[18] Since the families' claims are brought in state court pursuant to the Alaska Tort Claims Act,[19] and the *Feres* doctrine is, strictly speaking, a federal doctrine, we are not bound by its holding.

The question before us, then, is whether based on Alaska law we should apply the *Feres* doctrine to the families' claims simply because the claims arose "incident to military service." Before we judicially create

---

**12.** *See id.* at 692–93, 107 S.Ct. 2063 (Scalia, J., dissenting). Justices Brennan, Marshall, and Stevens joined Justice Scalia in this dissent.

**13.** *Id.* at 693, 107 S.Ct. 2063.

**14.** *Id.* at 700, 107 S.Ct. 2063.

**15.** *See Costo v. United States,* 248 F.3d 863, 869–76 (9th Cir.2001) (Ferguson, J., dissenting, arguing that *Feres* doctrine "violates the equal protection rights of military service men and women," "violates our constitutional separation of powers," and constitutes "a judicial re-writing of an unambiguous and constitutional statute"). *see also Estate of McAllister v. United States,* 942 F.2d 1473, 1480 (9th Cir.1991) ("In [affirming the district court], we follow a long tradition of reluctantly acknowledging the enormous breadth of a troubled doctrine.").

**16.** *See id.* at 864–69 ("reluctantly" concluding that the case "falls within the [*Feres*] doctrine's ever-expanding reach" and therefore applying the *Feres* doctrine "without relish"). *See also Estate of McAllister,* 942 F.2d at 1480 ("reluctantly" applying *Feres* ).

**17.** However, we have implicitly rejected the *Chappell* extension of the *Feres* doctrine that precluded all constitutional claims by soldiers against their superiors. *See Chappell v. Wallace,* 462 U.S. 296, 304, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). We held in *State, Dep't of Military and Vet. Affairs v. Bowen,* 953 P.2d 888 (Alaska 1998), that a guard member could bring a constitutional claim against a superior if the question was "not one of military expertise or one which causes interference with the military mission." *Id.* at 896 (footnote omitted).

**18.** *State v. Abbott,* 498 P.2d 712, 720 (Alaska 1972) (citation and internal quotation marks omitted).

**19.** Alaska Statute 09.50.250 is entitled "ACTIONABLE CLAIMS AGAINST THE STATE." It provides:

A person or corporation having a contract, quasi-contract, or tort claim against the state may bring an action against the state in a state court that has jurisdiction over the claim. A person who may present the claim under AS 44.77 may not bring an action under this section except as set out in AS 44.77.040(c). A person who may bring an action under AS 36.30.560–36.30.695 may not bring an action under this section except as set out in AS 36.30.685. However, an action may not be brought under this section if the claim

(1) is an action for tort, and is based upon an act or omission of an employee of the state, exercising due care, in the execution of a statute or regulation, whether or not the statute or regulation is valid; or is an action for tort, and based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused;

(2) is for damages caused by the imposition or establishment of a quarantine by the state;

(3) arises out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights; or

law that limits the civil remedies of military personnel in this state, we must determine if the existing law is inadequate to deal with this particular factual situation. Since existing law is adequate for this case, we decline to adopt the *Feres* doctrine at this time.[20]

We are not alone in choosing this path. While some states have adopted *Feres* outright,[21] others have chosen not to apply it. The Montana Supreme Court concluded that the *Feres* doctrine conflicted with the Montana Constitution,[22] which states that "Courts of justice shall be open to every person. . . . No person shall be deprived of . . . full legal redress for injury incurred in employment. . . ."[23]

Similarly, the Washington Supreme Court held that Washington has, by statute, waived its blanket sovereign immunity from suit.[24] While there is a narrow exception to that waiver for discretionary government acts,[25] the court held that not all of the acts at issue by the Washington National Guard fell within that exception.[26] As such, the State of Washington was not immune from being sued in tort by soldiers for the acts of fellow soldiers.[27]

■ The analytical framework adopted by Washington is sound. Alaska also has generally waived its sovereign immunity but has reserved it for discretionary governmental acts.[28] To determine if a governmental act is "discretionary" we employ the planning/ operational test.[29] A planning act is one that involves a basic policy decision, whereas an operational act involves the execution or implementation of a policy decision; only a planning act is entitled to immunity as a discretionary function.[30]

We have made this distinction because we recognize that "[m]uch of what is done by officers and employees of the government must remain beyond the range of judicial inquiry; obviously it is not a tort for the government to govern." [31]

We now apply this framework to the instant case. It was obviously a planning act to decide to bring General Himsel to Alaska to review the Army National Guard's training procedures. The decision to fly to Juneau from Anchorage aboard an Army National Guard C–12, flown by Colonel Clark, might also be considered a planning act. But if, as alleged, Colonel Clark flew the plane negligently, that negligence was not in the planning of the trip, but rather in the implementation of that plan. Therefore it is properly described as "operational." As such, the state is not immunized from liability.

The state argues that we must adopt the *Feres* doctrine lest the court inappropriately intrude upon military matters. But, as we noted in *State, Department of Military and Veterans Affairs v. Bowen,* not all questions

---

(4) arises out of the use of an ignition interlock device certified under AS 33.05.020(c).

**20.** The state cites *Stauber v. Cline,* 837 F.2d 395, 397–99 (9th Cir.1988), for the proposition that the Ninth Circuit has held that *Feres* bars claims against the State of Alaska, and that this is therefore settled law. We disagree. This assertion is in conflict with Article IV Section 2(a) of the Alaska Constitution that states: "The supreme court shall be the highest court of the state, with final appellate jurisdiction."

**21.** See *Mangan v. Cline,* 411 N.W.2d 9, 11–12 (Minn.App.1987); *Zaccaro v. Parker,* 169 Misc.2d 266, 645 N.Y.S.2d 985, 990–91 (Sup.Ct.1996), *aff'd mem.,* 249 A.D.2d 1003, 671 N.Y.S.2d 362 (App.Div.1998); *Wade v. Gill,* 889 S.W.2d 208, 209–10, 214–15 (Tenn.1994); *Newth v. Adjutant General's Dep't of Tex.,* 883 S.W.2d 356, 357 (Tex.App.1994).

**22.** See *Trankel v. State, Dep't of Military Affairs,* 282 Mont. 348, 938 P.2d 614, 621 (1997).

**23.** See *id.* (emphasis omitted) (quoting Mont. Const. Art. II, § 16).

**24.** See *Emsley v. Army Nat'l Guard,* 106 Wash.2d 474, 722 P.2d 1299, 1302 (1986) (citing Wash. Rev.Code § 4.92.090 (1963)).

**25.** See *id.*

**26.** See *id.* at 1303.

**27.** See *id.* at 1303–04.

**28.** See AS 09.50.250(1).

**29.** See *State v. Abbott,* 498 P.2d 712, 721–22 (Alaska 1972).

**30.** See *id.*

**31.** *Id.* at 721 (brackets in original) (internal citations and quotation marks omitted) (quoting *Johnson v. State,* 447 P.2d 352, 360 (Cal.1968)).

that involve the military require "military expertise" or are so uniquely military that judicial inquiry into them would cause undue interference with the military mission.[32] There is nothing "uniquely military" about a flight from Anchorage to Juneau, and evaluating whether Colonel Clark was negligent does not require special "military expertise." Simply put, the C–12 was being used to transport passengers between Anchorage and Juneau. It was not being used in combat or in training, nor were there exigent circumstances that prevented the members of the Himsel group from flying either on a chartered civilian plane or on a regularly scheduled commercial flight. If they had flown on either a chartered civilian plane or a commercial plane, it is unquestioned that the families could pursue a tort action against the employer of the pilot. Likewise, a civilian on board the C–12 would have a tort claim against Colonel Clark's employer. The only military aspect of the event causing the loss in this case was the objective of reviewing the National Guard facilities in Juneau; the nature of the flight during which the losses occurred is indistinguishable from an ordinary commercial flight. No reason appears why the military status of the passengers alone should limit their civil remedies. Accordingly, we hold that in this case the *Feres* doctrine does not preclude a tort action under Alaska law.

B. *There Exist Genuine Issues of Material Fact Regarding the State's Liability for Colonel Clark's Alleged Negligence.*[33]

We have generally adopted the view that vicarious liability or *respondeat superior* claims only arise "within the scope of employment."[34] Under this doctrine, two requirements must be met in order for an employer to be liable for an actor's negligence: (1) that the actor was an employee of the employer; and (2) that the alleged negligent act occurred within the scope of the employee's employment. However, as we first recognized in *Reader v. Ghemm Co.*,[35] there is an exception to the general rule of *respondeat superior:* An employer who borrows the employee of another can, in certain circumstances, be held liable for the negligent acts of the borrowed employee.[36]

We later modified the doctrine of the borrowed employee[37] in *Kastner v. Toombs* in a manner that left both the lending employer and the borrowing employer potentially liable for the negligent acts of the employee under a system that apportioned fault between the two employers.[38] Under the statutory system in place at that time, fault and liability were apportioned according to contribution and indemnity.[39] Alaska has since moved to a system of comparative negligence for apportioning liability according to fault.[40] Thus, liability under the doctrine of the borrowed employee is apportioned between the two employers according to comparative negligence. But we need not reach that issue here; it suffices to note that the state could be found liable to the families under the doctrine of the borrowed employee. Therefore, in order for the court to grant summary judgment on this issue, there must exist no genuine question as to whether Colonel Clark was either an employee of the state or a borrowed employee acting on behalf of the state.

32. 953 P.2d 888, 896 (Alaska 1998).

33. The superior court did not reach this issue because it granted summary judgment based on the *Feres* doctrine. In order to provide guidance to the superior court on remand, we discuss it now.

34. *Taranto v. North Slope Borough*, 909 P.2d 354, 358 (Alaska 1996) (internal quotation marks omitted) (quoting *Luth v. Rogers and Babler Constr. Co.*, 507 P.2d 761, 764–65 n. 14 (Alaska 1973)).

35. 490 P.2d 1200, 1203–04 (Alaska 1971).

36. *See Kastner v. Toombs*, 611 P.2d 62, 64 (Alaska 1980).

37. We use the phrase "the borrowed employee doctrine" here in place of the former term "the borrowed servant doctrine."

38. *See* 611 P.2d at 65–66.

39. *See id.* at 65 & n. 4.

40. *See* AS 09.17.060.

1. *Colonel Clark was not acting as an official State of Alaska employee at the time of the crash.*

a. *An Army National Guard technician is a federal employee.*

An Army National Guard technician such as Colonel Clark is "an employee of the United States."[41] As a technician, Colonel Clark was required to (1) "be a member of the National Guard;"[42] (2) hold the military rank appropriate for the position;[43] and (3) wear the appropriate uniform.[44]

Colonel Clark's "position" as a technician was that of Supervisory Aircraft Pilot/State Aviation Officer. The Alaska Army National Guard stated that at the time of the crash:

> Col. Clark was a Federal Excepted Military Technician. He was a federal employee which required him to hold a position in the Alaska Army National guard and wear the military uniform. He was not on active duty orders to fly because it was part of his position description as the SAO [State Aviation Officer]. Col. Clark was acting in his official capacity as the pilot and the SAO.

The families argue that Colonel Clark's status as the State Aviation Officer/State Supervisory Pilot made him a state employee. As discussed above, these duties were his "position" as a technician, not separate as the families infer. Even assuming for the sake of argument that the families' inference was correct, it is clear that State Aviation Officer/State Supervisory Pilot position is a federal one. In the federal "Position Description" for this position, Colonel Clark was assigned a federal pay and responsibility grade of GM–14.

b. *Colonel Clark was not acting as an Alaska Army National Guard member at the time of the crash.*

If, at the time of the crash, Colonel Clark was acting only as an Alaska Army National Guard member who had been placed on Active Guard Reserve (AGR) status, then he would have been a state employee at the time of the crash.[45]

The families argue that Colonel Clark was in AGR status because he was a member of the Alaska Army National Guard. This is incorrect. Merely being in the National Guard does not mean the Guard member is in AGR status. To be in AGR status, the Guard member must be ordered into it.[46] While there is a record of Colonel Wood, Sergeant Major Kahklen, Sergeant First Class Brink, and Sergeant Schmidt being so ordered, there is no such record for Colonel Clark.

Additionally, as previously discussed, both the Alaska Army National Guard and the United States Department of Justice stated that Colonel Clark was acting as a federal employee in his role as a technician serving as the State Aviation Officer at the time of the crash.[47]

In sum, since Colonel Clark was indisputably a federal and not a state employee at the time of the crash, the state cannot be vicariously liable as his employer for his alleged negligence.

2. *A reasonable jury could find that Colonel Clark was a borrowed employee acting on behalf of the State of Alaska.*

As previously noted, Alaska has reconciled the doctrine of *respondeat superior* with the doctrine of the borrowed employee so that when one employer borrows the employee of another employer, both may be held responsible for the negligent acts of that employee.[48] Accordingly, the State of Alaska

---

41. 32 U.S.C.A. § 709(d) (West Supp.1999).

42. *Id.,* § 709(b)(1).

43. *See id.,* § 709(b)(2).

44. *See id.,* § 709(b)(3).

45. *See State, Dep't of Military and Vet. Affairs v. Bowen,* 953 P.2d 888, 894 (Alaska 1998).

46. *See* 32 U.S.C.A. § 502(f) (West Supp.1999); *Bowen,* 953 P.2d at 891.

47. *See supra* Parts II, IV.B.1.a.

48. *See Kastner v. Toombs,* 611 P.2d 62, 65–66 (Alaska 1980).

may be liable for the acts of Colonel Clark if he was a borrowed employee acting for the state at the time of the accident.

In announcing the original doctrine of the borrowed employee, we stated: "A[n employee] directed or permitted by his [employer] to perform services for another may become the [employee] of such other in performing the services. He may become the other's [employee] as to some acts and not as to others."[49] The decisive question is whether the employee was loaned as to the particular acts at issue.[50] And the test turns on the question of control, or the transfer of control.[51] We have previously stated that "[t]he control which the borrowing [employer] must acquire for the servant to become loaned is not merely control over the [employee's] specific acts, but rather control in a broader sense."[52]

Evidence in the record suggests that the state may have exerted control over Colonel Clark regarding the acts in question. For example, the "Position Description" for Colonel Clark's job states that the State Army Aviation Officer and Safety Officer for a State Army National Guard (ARNG) "[m]anages the ARNG aviation program *of the state* which includes planning, coordinating, implementing and directing all aviation assets within the State ... [and acts] as a liaison with all organizations concerning matters relevant to aviation support." (Emphasis added.) Further, this position "[c]ontrols the aviation program *for the state* ..." and the provisions of the U.S. Army Aircrew Training program must be complied with when acting as "a pilot in an Army aircraft *assigned to the State.*" (Emphasis added.) And, several of the passengers on the flight had been called into AGR status and were thus considered state employees. There is at least some evidence in the record that acts of Colonel Clark, in his capacity as the State Aviation/Safety Officer, may have been controlled by the state both specifically and generally. Whether the state exerted such control is therefore a disputed material fact. Upon remand, the plaintiffs are entitled to trial on this issue.

## V. CONCLUSION

Because we decline to hold that the state is immune under the doctrine of *Feres v. United States* in the circumstances of this case, and because genuine issues of fact exist as to whether Colonel Clark was acting on behalf of the State of Alaska as a borrowed employee, we REVERSE and REMAND to the superior court for further proceedings consistent with this opinion.

MATTHEWS, Chief Justice, with whom EASTAUGH, Justice, joins, dissenting.

In my opinion the doctrine of intra-military immunity was properly held to govern this case. The doctrine, an outgrowth of *Feres v. United States*,[1] bars claims by military service personnel against military actors for injuries arising out of activities that are "incident to service."[2] It applies to state common law tort claims,[3] state statutory claims,[4] federal constitutional tort claims,[5] and federal statutory claims,[6] as well as

---

**49.** *Reader v. Ghemm Co.*, 490 P.2d 1200, 1203 (Alaska 1971) (quoting 1 Restatement (Second) of Agency § 227 (1957)).

**50.** *See id.* (citing 1 Restatement (Second) of Agency § 227 cmt. a at 501).

**51.** *See id.* (citations omitted).

**52.** *Id.*

**1.** 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).

**2.** *Id.* at 146, 71 S.Ct. 153; *see Durant v. Neneman*, 884 F.2d 1350, 1352 (10th Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 728 (1990).

**3.** *See, e.g., Wade v. Gill*, 889 S.W.2d 208, 214 (Tenn.1994) (*Feres* doctrine precludes state claim for battery.).

**4.** *See, e.g., Newth v. Adjutant Gen.'s Dep't of Texas*, 883 S.W.2d 356, 359–60 (Tex.App.1994) (*Feres* doctrine precludes claim alleging violation of state whistleblower act.).

**5.** *See, e.g., Crawford v. Texas Army Nat'l Guard*, 794 F.2d 1034 (5th Cir.1986) (Constitutional claims barred by *Feres* doctrine.).

**6.** *See, e.g., Uhl v. Swanstrom*, 79 F.3d 751, 756 (8th Cir.1996) (Civil rights and Privacy Act suit barred by *Feres* doctrine.); *see also Watson v. Arkansas Nat'l Guard*, 886 F.2d 1004, 1008–09 (8th Cir.1989) (Race discrimination suit brought

claims brought under the Federal Tort Claims Act.[7] It immunizes not only the United States, but individual service personnel and state National Guard agencies.[8]

In *Stauber v. Cline*[9] the Ninth Circuit applied the doctrine of intra-military immunity to claims that had been brought by one employee of the Alaska Army National Guard against other employees of the Guard and of the State of Alaska. In holding that the doctrine of intra-military immunity applied and barred state law tort claims the court explained the rationale of the doctrine:

> [T]he *Feres* doctrine has come to rest at least in significant part on the view that the judiciary ought not to intrude in military affairs.[6] Thus the *Feres* rule has been interpreted as necessary to avoid the courts' second-guessing military decisions, or impairing military discipline. *Shearer*, 473 U.S. at 57, 105 S.Ct. at 3043; *see Chappell v. Wallace*, 462 U.S. 296, 304, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). Indeed, courts have even been viewed as " 'ill-equipped to determine the impact upon discipline that any particular intrusion upon military authority might have.' " *Chappell*, 462 U.S. at 305, 103 S.Ct. at 2368 (quoting Warren, *The Bill of Rights and the Military*, 37 N.Y.U.L.Rev. 181, 187 (1962)).
>
> Thus the *Feres* doctrine, as presently interpreted, has far more to do with the proper relation between the courts, Congress and the military than it has to do with individual defendants. It is not a matter of personal immunity of the military personnel who may be defendants in a *Bivens*-type action incident to military services. *United States v. Stanley*, 483 U.S. 669, 107 S.Ct. 3054, 3064, 97 L.Ed.2d 550 (1987). It is a judicial doctrine leaving matters incident to service to the military, in the absence of congressional direction to the contrary.

by National Guard member under 42 U.S.C. §§ 1981 and 1983 barred by *Feres* doctrine.).

7. *See, e.g., United States v. Johnson*, 481 U.S. 681, 692, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987); *see also Feres*, 340 U.S. at 146, 71 S.Ct. 153.

8. *See Crawford*, 794 F.2d 1034 (Dismissing claims of constitutional violations against Texas

6. Declining to permit review of National Guard internal operations on justiciability grounds, in *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973), the Supreme Court noted that it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.

> *Id.* (emphasis in original), quoted in *Chappell v. Wallace*, 462 U.S. 296, 302, 103 S.Ct. 2362, 2366, 76 L.Ed.2d 586 (1983)[.] [10]

The doctrine of intra-military immunity immunizes not only military personnel, but their employers. Thus states, as employers of military personnel in the National Guard, are immunized by the doctrine. This issue was discussed in the context of the Alaska Air National Guard by the Ninth Circuit in *Bowen v. Oistead.*[11] *Bowen* involved, among other claims, tort claims by Bowen, a member of the National Guard, against other Guard members and the state. The Ninth Circuit held that the doctrine of intra-military immunity barred his claims against the state Guard officers and the state, discussing this issue at some length. The court stated:

> While Bowen's first argument against the application of the *Feres* doctrine focuses upon his own status as a state employee, his second argument against *Feres* focuses upon the status of the defendants. Bowen urges us not to bar his claims against the *state* officers because, he argues, the *Feres* doctrine "cannot be applied to the states," *i.e.*, it is applicable only to those actions where federal military personnel are somehow implicated in the alleged unlawful conduct. Thus, Bowen distinguishes *Stauber* by noting that the parties in that case were "under the

Army National Guard and individual military personnel.).

9. 837 F.2d 395 (9th Cir.1988).

10. *Id.* at 398–99.

11. 125 F.3d 800 (9th Cir.1997).

direct command of a uniformed, full-time U.S. Army lieutenant colonel." *See Stauber*, 837 F.2d at 397.

In *United States v. Johnson*, the Supreme Court noted that it had

> never suggested that the military status of the alleged tortfeasor is crucial to the application of the [*Feres*] doctrine. Nor have the lower courts understood this fact to be relevant under *Feres*. Instead, the *Feres* doctrine has been applied consistently to bar all suits on behalf of service members against the Government based upon service-related injuries.

481 U.S. 681, 686–88, 107 S.Ct. 2063, 2066–67, 95 L.Ed.2d 648 (1987).

> *Courts have not interpreted this language to mean that the service person's suit must be against the federal government or federal officers. The overwhelming weight of authority indicates that state National Guard officers are protected from suit by fellow Guardsmen by the Feres doctrine.* *Stauber*, for example, applied *Feres* to a Guardsman's claims against individual members of the Alaska National Guard, the Alaska Adjutant General, the Alaska Department of Military and Veterans Affairs, and the State of Alaska itself. *See also Uhl v. Swanstrom*, 79 F.3d 751 (8th Cir.1996) (applying *Feres* bar to suit by National Guardsman against

his commanding state officer, the Adjutant General of the Iowa Air National Guard, and the Iowa Air National Guard); *Lovell v. Heng*, 890 F.2d 63 (8th Cir.1989) (National Guardsman's § 1983 action against state National Guard officers barred under *Feres* ); *Townsend v. Seurer*, 791 F.Supp. 227, 229 (D.Minn.1992) ("[R]egardless of whether the suit is brought against the state National Guard and individual Guard personnel or against the United States and individual Guard personnel, the *Feres* doctrine will bar the action."). Indeed, we indicated in *Stauber* that the *Feres* doctrine "has far more to do with the proper relation between the courts, Congress and the military than it has to do with individual defendants. . . . It is a judicial doctrine leaving matters incident to service to the military, in the absence of congressional direction to the contrary." *Stauber*, 837 F.2d at 399.[12]

There are literally scores of cases applying the doctrine of intra-military immunity to National Guard officers and their employers.[13]/[14]

Moreover, as *Bowen* indicates, the application of the doctrine of intra-military immunity is a question of federal law even when applied to state defendants based on state claims. Discussing some of the numerous

12. *Id.* at 804–05 (emphasis added).

13. *See, e.g., Speigner v. Alexander*, 248 F.3d 1292, 1298 (11th Cir.2001); *Meister v. Texas Adjutant Gen.'s Dep't*, 233 F.3d 332, 338 (5th Cir.2000); *Jones v. State, Div. of Military & Naval Affairs*, 166 F.3d 45, 52 (2nd Cir.1999); *Wright v. Park*, 5 F.3d 586, 590–91 (1st Cir.1993); *Knutson v. Wisconsin Air Nat'l Guard*, 995 F.2d 765, 770–71 (7th Cir.1993); *Wood v. United States*, 968 F.2d 738, 740 (8th Cir.1992); *Watson v. Arkansas Nat'l Guard*, 886 F.2d 1004, 1009 (8th Cir.1989); *Crawford v. Texas Army Nat'l Guard*, 794 F.2d 1034, 1035–36 (5th Cir.1986); *Brown v. United States*, 739 F.2d 362, 366 (8th Cir.1984); *Martelon v. Temple*, 747 F.2d 1348, 1350–51 (10th Cir.1984); *Mollnow v. Carlton*, 716 F.2d 627, 629–30 (9th Cir.1983); *Gordon v. Illinois Nat'l Guard*, 46 F.Supp.2d 817, 819 (C.D.Ill.1999); *Uhl v. Swanstrom*, 876 F.Supp. 1545, 1570 (N.D.Iowa 1995); *Egloff v. New Jersey Air Nat'l Guard*, 684 F.Supp. 1275, 1283 (D.N.J.1988); *Williams v. Colorado Air Nat'l Guard*, 821 P.2d 922, 925 (Colo.App.1991); *Estate of Burris v.*

*State*, 360 Md. 721, 759 A.2d 802, 814 (2000); *Harris v. Missavage*, 165 Mich.App. 96, 418 N.W.2d 687, 690 (1987); *Zaccaro v. Parker*, 249 A.D.2d 1003, 671 N.Y.S.2d 362 (N.Y.App.Div. 1998); *Newth v. Adjutant Gen.'s Dep't of Texas*, 883 S.W.2d 356, 360 (Tex.App.1994).

14. By contrast, so far as I am aware, only two jurisdictions, Montana and Washington, reject the doctrine of intra-military immunity with respect to the National Guard. *See Trankel v. State, Dep't of Military Affairs*, 282 Mont. 348, 938 P.2d 614, 621 (1997); *Emsley v. Army Nat'l Guard*, 106 Wash.2d 474, 722 P.2d 1299 (1986); *Kirtley v. State*, 49 Wash.App. 894, 748 P.2d 1128 (1987). But the courts of these states nonetheless make clear that claims by Guard personnel arising out of their Guard employment against the state are not permitted for other reasons. *See Trankel*, 938 P.2d at 617–18, 623; *and see Schuff v. A.T. Klemens & Son*, 303 Mont. 274, 16 P.3d 1002, 1021 (2000) (explaining *Trankel* ); *Emsley*, 722 P.2d at 1304 (concurring opinion of Justice Callow); *Kirtley*, 748 P.2d at 1130.

cases which have applied *Feres* to Guardsmen's claims, the *Bowen* court stated:

> These cases implicitly recognize that the military apparatus of the United States cannot be divided into strictly state and federal components. We endorse these holdings: *Feres* applies to the state National Guards and their members due to the integral role they play as part of the nation's defense force and the substantial degree to which the state National Guards are financed, regulated, and controlled by the federal government even when not called into active federal service. Consequently, under *Stauber* and the clear weight of authority in other circuits, Bowen's constitutional claims and claims sounding in tort are subject to the *Feres* doctrine.[15]

Since the doctrine of intra-military immunity is a matter of federal law we need not ask whether state law contains a similar immunity. The federal immunity applies to state law claims for reasons found sufficient under federal law. But even if the immunity were not imposed by federal law, I believe that state law should adopt it for a number of reasons.

First, the basic rationale that military decisions affecting military personnel should not be reviewed in civilian courts is persuasive. The Supreme Court of the United States articulated this rationale in *Chappell v. Wallace*.[16] In so doing the Court included within its discussion state National Guards:

> Congress' authority in this area, and the distance between military and civilian life, was summed up by the Court in *Orloff v. Willoughby, supra,* 345 U.S. at 93–94, 73 S.Ct. at 540:
>
> > [J]udges are not given the task of running the Army. The responsibility for setting up channels through which ... grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States

and his subordinates. The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters.

Only recently we restated this principle in *Rostker v. Goldberg,* 453 U.S. 57, 64–65, 101 S.Ct. 2646, 2651, 69 L.Ed.2d 478 (1981):

> The case arises in the context of Congress' authority over national defense and military affairs, and perhaps in no other area has the Court accorded Congress greater deference.

In *Gilligan v. Morgan,* 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), we addressed the question of whether Congress' analogous power over the militia, granted by Art. I, § 8, cl. 16, would be impermissibly compromised by a suit seeking to have a Federal District Court examine the "pattern of training, weaponry and orders" of a state's National Guard. In denying relief we stated:

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. *The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject always to civilian control of the Legislative and Executive Branches.* The ultimate responsibility for these decisions is appropriately vested in branches of the gov-

---

15. *Bowen,* 125 F.3d at 805. *See also Day v. Massachusetts Air Nat'l Guard,* 167 F.3d 678, 684–85 (1st Cir.1999) (where the First Circuit indicated that there is a consensus view that supports a federal immunity, based on "federal policies to protect military autonomy," applicable to state claims where the defendants' conduct

is within the scope of their employment by the National Guard).

16. 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983).

ernment which are periodically subject to electoral accountability.

*Id.*, at 10, 93 S.Ct. at 2446 (emphasis in original).[17]

Second, the Alaska Claims Against the State Act was first adopted by the territorial legislature in 1957[18] and was recodified without substantial change by the state legislature in 1962.[19] The Alaska act was closely modeled on the Federal Tort Claims Act. We have recognized this in a number of cases,[20] noting that we "rely heavily on federal cases interpreting the Federal Tort Claims Act."[21] There is "[a] rebuttable presumption ... that when Alaska bases a statute on one from another jurisdiction, it adopts into the Alaska statute all previous cases from the other jurisdiction's statute."[22] The *Feres* decision was handed down in 1950. Another notable case interpreting *Feres* and the Federal Tort Claims Act, *United States v. Brown*,[23] was published in 1954. Thus the *Feres* doctrine was a well-established feature of the Federal Tort Claims Act when the territorial legislature decided to adopt a similar act for Alaska. Since there is no basis for rebutting the presumption that a borrowed statute carries with it prior judicial interpretations, Alaska's Claims Against the State Act should be construed as adopting the interpretation which *Feres* gave to the Federal Tort Claims Act.

The Supreme Court in *Feres* gave as one reason for its decision that "no American law ... ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving."[24] Further, the *Feres* Court observed that it knew of no state "which has permitted members of its militia to maintain tort actions for injuries suffered in the service...."[25] The Court thus concluded that to permit service personnel to sue their commanders in tort would be "to visit the Government with novel and unprecedented liabilities" beyond the purposes of the Federal Tort Claims Act.[26] It is hard to believe that the legislature in modeling the Alaska Claims Act on the Federal Tort Claims Act meant to permit the kind of claim that *Feres*, in interpreting the Federal Tort Claims Act, had already rejected as novel and unprecedented.

Further, AS 26.05.060 explicitly provides that the Alaska National Guard and its members "are subject to all federal laws and regulations relating to the National Guard and Naval Militia of the several states and territories of the United States." The *Feres* doctrine applies to the National Guards of the several states. The doctrine is a matter of federal law. By application of AS 26.05.060 it should also apply to the Alaska National Guard.

Today's opinion does not appear to completely reject all forms of intra-military immunity. Instead, the court suggests that where an action is "uniquely military" or requires "military expertise" to evaluate, a case for immunity might exist.[27] As a dividing line separating immune from non-im-

17. *Id.* at 301–302, 103 S.Ct. 2362 (emphasis added).

18. Ch. 170, § 1, SLA 1957.

19. Ch. 101, § 26.01–06, SLA 1962.

20. *See, e.g., State v. Abbott*, 498 P.2d 712, 720 (Alaska 1972); *State v. I'Anson*, 529 P.2d 188, 192 (Alaska 1974).

21. *P.G. v. State, Dep't of Health & Human Servs., Div. of Family & Youth Servs.*, 4 P.3d 326, 335 (Alaska 2000); *see also State, Dep't of Transp. & Pub. Facilities v. Sanders*, 944 P.2d 453, 457 (Alaska 1997).

22. *City & Borough of Sitka v. Construction & Gen. Laborers Local 942*, 644 P.2d 227, 231 n. 8 (Alaska 1982). We also recognized and applied this rule in *City of Fairbanks v. Schaible*, 375 P.2d 201, 207–08 (Alaska 1962) ("It [an interpre-

tation by the Oregon Supreme Court] then became the law in Alaska by reason of the well established rule that a statute adopted from another state, which has been construed by that state's highest court, is presumed to be adopted with the construction thus placed upon it.").

23. 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954) (Discharged veteran could maintain malpractice action against VA hospital because the injuries resulting from the malpractice were not received incident to military service.).

24. *Feres*, 340 U.S. at 141, 71 S.Ct. 153.

25. *Id.* at 142, 71 S.Ct. 153.

26. *Id.*

27. *See* Op. at 40–41.

mune conduct, the majority's "uniquely military/military expertise" test strikes me as being very difficult to apply. In a way it resembles the now thoroughly discredited "governmental/proprietary" dichotomy formerly used to determine municipal immunity.[28] No case of which I am aware uses a "uniquely military/military expertise" test as a means to separate immune from non-immune activity.

Further, the test proposed by the majority would result in inappropriate intrusion into the affairs of military discipline and decision-making in a great many instances. For example, if one National Guard member sued another National Guard member in tort for a battery which occurred while the two were filing documents in an office, such a suit would be permitted under the test proposed by the majority. Filing is clearly not a "uniquely military" activity. Yet, the activity (battery by one serviceperson against another) clearly and directly implicates military discipline and command structure. It would be inappropriate for a civilian court to step in and adjudicate the dispute, because to do so could compromise the National Guard's ability to discipline its own members.[29]

Moreover, it is unclear which side of the "uniquely military/military expertise" line the present case should fall. We are told that the plane, a C–12 transport, was a military aircraft owned by the United States, that it was piloted by military personnel, and that all the passengers were military under military orders. I assume that the navigation and communication systems on the plane were military, that the plane was built to specifications under a military contract, and that military standards exist governing how planes such as this should be flown. If this is true, then to some degree military unique-

ness and expertise will be present, but it will remain unclear as to whether that degree is sufficient to impart immunity.

It seems to me that the uncertainty implicit in the suggested "uniquely military/military expertise" test of the majority is a good reason to adhere to the "incident to service" test which distinguishes immune from non-immune activities under the doctrine of intra-military immunity. Even if the majority's test were certain of application, it would still be necessary to litigate each case fairly extensively in order to develop the necessary facts to apply the test. Avoidance of such litigation is one of the reasons for the intra-military immunity doctrine. Justice Scalia, writing for the majority in *United States v. Stanley*,[30] discussed and rejected other proposed tests more inclusive of liability than the "incident to service" test. He wrote:

> Stanley underestimates the degree of disruption that would be caused by the rule he proposes. A test for liability that depends on the extent to which ·particular suits would call into question military discipline and decisionmaking would itself require judicial inquiry into, and hence intrusion upon, military matters. Whether a case implicates those concerns would often be problematic, raising the prospect of compelled depositions and trial testimony by military officers concerning the details of their military commands. Even putting aside the risk of erroneous judicial conclusions (which would becloud military decisionmaking), the mere process of arriving at correct conclusions would disrupt the military regime. The "incident to service" test, by contrast, provides a line that is relatively clear and that can be discerned with less extensive inquiry into military matters.[31]

---

**28.** The latter dichotomy has generally been abandoned because of the great difficulty that courts had in determining when a municipality was acting in a governmental capacity and when it was acting in a proprietary capacity. Prosser, discussing some of the imponderable questions posed by this dichotomy concluded that "[t]here is little that can be said about such distinctions except that they exist, that they are highly artificial, and that they make no great amount of sense." William L. Prosser, *Handbook of the Law of Torts* § 131, at 982 (4th ed.1971).

**29.** *Cf. Wade v. Gill*, 889 S.W.2d 208 (Tenn.1994) (ruling that *Feres* doctrine precluded suit under factual situation described above).

**30.** 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987).

**31.** *Id.* at 682–83, 107 S.Ct. 3054.

Although the majority accurately cites *State, Department of Military & Veteran's Affairs v. Bowen*[32] for the unexceptional proposition that not all questions that involve military people require "military expertise" or will interfere with a particular military mission,[33] it does not follow that *Bowen* rejected the doctrine of intra-military immunity. *Bowen* in fact does not mention this doctrine, or *Feres*, and none of the briefs filed before this court in that case did so either. *Bowen* was an administrative appeal in which the question was whether a National Guard officer who was involuntarily terminated had a right to a pre-termination hearing. We answered that question in the affirmative based on a federal statute permitting termination of Guard personnel "as provided by the laws of the State";[34] we construed the reference to the laws of the state in the federal statute to include the due process clause of the state constitution which requires pre-termination hearings for government employees.[35]

In conclusion, more than fifty years after *Feres v. United States* was decided, the observations of Justice Jackson, writing for a unanimous Court in *Feres*, remain true. No state has permitted members of its National Guard to maintain incident to service tort claims against the state. To do so would still be both "novel and unprecedented." I believe that we should continue to follow the accumulated wisdom implicit in more than half a century of decisional law.

Today's decision sets off on a course that conflicts with the doctrine of intra-military immunity. That doctrine must be followed, in my opinion, because it is a matter of federal law based on federal policies protective of military autonomy. Further, the *Feres* doctrine was implicitly adopted as a matter of territorial and state law when the Alaska Claims Act, modeled on the Federal Tort Claims Act, was adopted. Today's opinion also seems to adopt a confusing and unworkable test which purports to distinguish between uniquely military activities and those involving military expertise, im-

mune to civilian judicial oversight, and activities which are not uniquely military and do not require military expertise, which civilian courts may review. The distinction is not only unmanageable as a practical matter, but it also inappropriately exposes military discipline, command structure, and decision-making to civilian scrutiny—precisely what the *Feres* doctrine is designed to prevent.

I therefore dissent.

---

**32.** 953 P.2d 888, 896 (Alaska 1998).

**33.** *See* Op. at 41.

**34.** *See* 32 U.S.C. § 324(b).

**35.** *Bowen*, 953 P.2d at 894, 894–95.