**Robert L. YATES, Appellant,**

v.

**Richard W. HALFORD and VECO Corporation, Appellees.**

No. S–10438.

Supreme Court of Alaska.

July 18, 2003.

---

William F. Brattain II, Baker Brattain LLC, Anchorage, for Appellant.

Thomas E. Williams, Keith A. Christenson, Eagle River, for Appellee Halford.

Todd J. Timmermans, Price & Price, Anchorage, for Appellee VECO Corporation.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

The question in this case is whether summary judgment was properly granted in favor of a party who had strictly foreclosed a land sale contract. We conclude that summary judgment was improper because the grounds relied on by the movant were both factually disputed and legally insufficient and the movant failed to show that he was entitled to strict foreclosure as a matter of law.

## I. STATEMENT OF FACTS

### A. Background

In 1994 Richard Halford sold Robert Yates real property consisting of a lodge and some seventy-four acres located near the Denali Highway. The sale was accomplished under an "Agreement for Purchase and Sale of Real Estate and Personal Property." The purchase price was $320,000, payable by means of a $6,000 deposit upon execution of the agreement, $34,000 cash at closing, and the remainder of $280,000 to be paid per the terms of a promissory note: $30,000 in principal for each of the following two years plus interest, with the balance due in August 1997. The promissory note was secured by a deed of trust on the property. Yates hoped to renovate the lodge in order to start an ecotourism venture. The agreement contained default remedies, including an option for termination of the agreement upon "written notice." [1]

After apparently fulfilling his obligations at least through 1995,[2] Yates defaulted on his obligations. Rather than foreclose, Halford proposed that the parties enter into a new agreement. Yates agreed and the parties on July 30, 1997, signed a new agreement—characterized as a "conveyance back and resale"—that both incorporated and made changes to the 1994 Agreement.[3] Notably, the purchase was narrowed to only the "fifteen acres, immediately surrounding the Lodge," and the purchase price was reduced to $118,035.80. The price was payable as follows: $5,000 upon execution of the agreement; $33,035.80 at closing; followed by sixteen quarterly installments of $5,000 each plus interest. The new agreement also included a two-year option, "personal to Robert

---

1. A section entitled "DEFAULT; REMEDIES" provided in part that, in the event of a material breach or default by either seller or purchaser, the injured party had "the right to (a) demand and have specific performance of this Agreement; or (b) terminate this Agreement upon written notice without liability [to the other.]"

   Also incorporated into the 1994 agreement was a deed of trust concerning delivery of title upon fulfillment of the promissory note. Regarding default, the deed of trust read as follows:

   Upon default by Trustor in payment of any indebtedness secured hereby or in performance of any agreement hereunder, all sums secured hereby shall immediately become due and payable at the option of the Beneficiary. In the event of default Beneficiary may execute or cause the Trustee to execute a written notice of such default and of his election to cause to be sold the herein described property to satisfy the obligation hereof, and, if the written notice is executed, shall cause such notice to be recorded in the office of the recorder of each recording precinct wherein said real property of [sic] some part thereof is situated.

   . . . .

   In the alternative, the Beneficiary may foreclose under AS 09.45.

2. Yates claimed in his deposition that $80,000 from a land sale in Montana was forwarded to Halford as payment for the land after closing.

3. Regarding the incorporation of the 1994 Agreement, the 1997 Agreement included the following paragraph:

   The parties understand and agree that by incorporating the June 22, 1994 agreement, many provisions may no longer apply, partially because of the Seller's three year possession, and because of Seller's possession between the date of signing this agreement and the closing date of September 15, 1997. The parties specifically agree to be reasonable in re-applying the June 22, 1994 contract to this contract dated July 29, 1997.

Yates,"[4] to purchase the remaining acreage for $200,000.

The parties closed the new agreement on September 16, 1997. Yates paid the required down payment and the parties signed a separate document entitled "Closing of Sale Contract," containing the following language:

> The Purchaser has repaired the lodge roof and has agreed to re-roof prior to September 1, 1998.
>
> The Purchaser represents that all the taxes are current at this time.
>
> *Thirty days after written notice of default,* the Seller may declare a default and repossess the property.
>
> Both the Seller and the Purchaser agree that all other terms and conditions in the Agreement for Purchase and Sale are binding and in full effect.

(Emphasis added.)

According to Yates's subsequently filed complaint, almost three months after the closing of the sale contract Halford's attorney, Thomas E. Williams, "advised Jerald Briske, who was acting as an agent and assistant to [Yates], that [Yates] would have to pay an additional sum of $500" for attorney's and platting waiver fees. Yates claims that Briske delivered a check to Williams in that amount, drawn on the account of "Coast–Line Enterprises, Inc." and signed by Briske. Briske supports this account in an affidavit.

On January 28, 1998, four months after the closing, Williams sent Yates a letter that declared the transaction "a failure" and purported to terminate the agreement. Williams alleged that Yates was "unable or unwilling to complete the terms of closing" and listed multiple delinquencies, including failure to pay past due taxes as well as the quarterly payment due in December 1997.

On February 18, 1998, Yates's attorney, Joan Travostino, responded by letter claiming that termination of the contract was premature because Halford had never given thirty days written notice of default, not even in the January 28th letter. "A written notice of default states what performance is in de-

fault and what is owing. The January 28 letter does not do this." She concluded therefore that Yates still had time to cure.

Enclosed with Travostino's letter were three checks, each in the amount of $4,010. A breakdown detailed that the $12,030 covered all the back taxes, some survey work, a platting waiver fee, and the missed payment, including interest through December 15. Each check came from a different bank and referenced a different maker, Yates, Briske, and John Lutz.

On March 5 Williams refused the uncashed checks and explained why Yates was deficient in his efforts to cure the defaults.[5] Williams stated that the new agreement "clearly established that this sale was to be directly to Mr. Yates and should there be a subsequent sale, the loan would be accelerated." He also noted that the option to purchase the remaining acreage was "personal to Mr. Yates." Williams also accused Yates of misrepresentation concerning payment of taxes and failing to fulfill a condition of the contract:

> The new sale was merely a contract to purchase. On September 16, 1997, Mr. Yates represented to Mr. Halford that the 1996 taxes had been paid. In fact, they were not paid until Mr. Halford himself paid them in 1998; therefore, the conditions of the sale contract were never completed.

Williams also implied that Yates had received adequate notice of default because "Mr. Yates and Mr. Halford had many telephone exchanges between September and the termination of the contract whereby Mr. Halford told Mr. Yates that he needed to finish the details of the closing."

On April 2, 1998, Yates renewed his effort to cure the default by re-tendering $12,030. This tender was rejected. On October 20, 1998, Yates's new attorney, Marshall K. Coryell, advised Halford that a sum covering the December 1997 payment plus the March, June, and September 1998 payments plus other sums in dispute had been deposited

---

**4.** The option stated that it "cannot be sold or separated from the purchase and sale of the Lodge."

**5.** We assume by the negative tone of Williams's March 5 letter that he refused the checks. He more explicitly made this refusal in a June 23 letter.

with a title company and would be available to Halford upon reinstatement of the transaction. This offer was ignored. Meanwhile, on or about June 30, 1998, Halford sold all the property to VECO Corporation. When Yates learned of the sale he vacated the property.

### B. Proceedings

Yates sued Halford and VECO on December 22, 1998, seeking to set aside the strict foreclosure and reinstate the sale contract.

After settlement negotiations Halford offered Yates three different settlement options, ostensibly under Alaska Civil Rule 68, requiring Yates to either pay off the debt or bring payments current on specified dates; interest was included in each option. But Yates objected to "the interest calculations" and no agreement was reached.[6]

Depositions of Halford and Yates were taken. At his deposition Yates disclosed the existence of a "Memorandum of Understanding" between himself, Briske, and Lutz. In response to this disclosure Halford moved for sanctions against Yates. Halford argued that Yates should have disclosed these relationship earlier, and that Yates had mischaracterized Briske's role in the complaint by referring to him as an "agent and assistant." Halford also contended that the existence of the memorandum of understanding proved that Yates had already sold the property, thus triggering the "due on sale" clause and nullifying the option to purchase the 200 acres. Halford added that, because Briske and Lutz were "real parties in interest" to the property, they were indispensable parties to the action for specific performance.[7]

Halford attached to the motion a copy of the memorandum of understanding. Of particular concern to Halford was the following portion of the memorandum:

1. It is the intent of the Partners to obtain share equal ownership of the property and to create an appropriate business entity organized under Alaska law for the purposes of such equal ownership;

. . . .

3. It is the intent of the Partners to accept an assignment of all rights and delegation of all duties heretofore held by Robert Yates under the terms of the July 30, 1997 Agreement[.]

Yates did not contest the existence of an understanding between himself, Briske, and Lutz. Rather, he argued that Halford had always been fully aware of the relationship and that any nondisclosure was an irrelevant oversight. Yates attached an affidavit from Briske detailing his numerous contacts with Halford regarding the property. Briske added:

Another associate, JOHN LUTZ, and I have had an agreement in place since September, 1997 with Mr. Yates whereby we would become partners in the Susitna Lodge operation *after* Mr. Yates purchased the property and exercised his option on the additional acreage around the Lodge under the terms of the 1997 Agreement Mr. Yates had with Mr. Halford to buy the property. At no time have we ever claimed a current interest in the property. . . .

(Emphasis in original.) Finally, Yates attached a segment of Halford's deposition where Halford acknowledged having a conversation with Lutz about the property and hearing, "by rumor," that Briske had made a $500 payment on behalf of Yates.

Superior Court Judge John Reese denied Halford's motion for sanctions. The order stated:

Defendant Halford requests sanctions for plaintiff's failure to disclose his relationship to Lutz and Brisk[e]. The record does not disclose a close enough relationship to the property by these two men to make their non-disclosure a requirement under Civil Rule 26. The motion is DENIED.

Halford subsequently moved for summary judgment,[8] premising the motion partly on

---

6. Halford made another Rule 68 offer in July of 1999 to settle in exchange for payment of arrearages "simplified as to its terms." But this offer again included full interest and Yates again failed to accept.

7. Halford cited *Sowash v. Garrett,* 630 P.2d 8 (Alaska 1981).

8. VECO filed a joinder in motion for summary judgment four days later.

the court's ruling that Lutz and Briske were not closely associated with the property:

> [The motion for sanctions] was denied by the Court. In making that decision, the Court effectively made the determination that Mr. Yates' ostensible "partners" are not indispensable parties to the Plaintiff's case. That determination thereby became "the law of the case."

Halford contended that Yates "has admitted at deposition that he didn't and doesn't have the financial ability to complete the transaction he is trying to enforce." According to Halford, two quotes in Yates's deposition indicated that Yates "was not in a financial position to accomplish the necessary renovation without borrowing from some source." Halford then cited a "recognized requirement" of Alaska case law:

> It is axiomatic that to obtain specific performance, a buyer must prove not only that he was ready, willing and able to perform at the time the contract was entered into but that he continued ready, willing and able to perform at the time suit was filed and during the prosecution of the specific performance action.[9]

Halford concluded that, because Yates was asking for specific performance of the contract but was not actually in a position to perform, the case must be dismissed.

At the time Yates was without counsel. He filed a motion for extension of time. In case the extension was denied, he also included in the same motion his "opposition" argument. The opposition portion of his motion focused on his current ability to pay: "Currently, I certify to the Court that my financial circumstances have improved and that with the assistance of potential investors, I would be able to bring the Note payments current."

On August 29, 2001, the superior court granted Halford's motion for summary judgment, and subsequently entered final judgment in favor of both Halford and VECO.

Yates appeals.

## II. DISCUSSION

■ We review grants of summary judgment de novo.[10] It is the duty of the court to determine whether there are disputed factual issues that would preclude the entry of judgment as a matter of law.[11] The facts offered in support of and in opposition to a motion for summary judgment will be construed in a light most favorable to the non-moving party.[12] The burden is on a party seeking summary judgment to show that there are no genuine issues of material fact and that he is entitled to judgment as a matter of law.[13]

■ In granting summary judgment, the superior court gave no reasons in support of its order. In such circumstances we review all grounds on which the movant relied to determine whether any grounds were sufficient.[14] In the present case Halford and VECO offered only one reason in support of their joint motion, namely that Yates was not entitled to specific performance because he lacked the financial ability to perform his obligations under the contract.

In making this argument Halford relied on the court's ruling denying sanctions against Yates to the effect that Lutz and Briske did not have a sufficiently close relationship to the property to make their nondisclosure sanctionable under Civil Rule 26. According to Halford, this ruling became "the law of the case." He argued that "Yates stands alone with respect to his purchase of this property ... and it is Mr. Yates alone who must establish his financial ability to fulfill the obligations of the contract he is seeking to enforce."

---

**9.** Quoting *Foster v. Hanni*, 841 P.2d 164, 172 (Alaska 1992).

**10.** *Beilgard v. State*, 896 P.2d 230, 233 (Alaska 1995).

**11.** *Drake v. Hosley*, 713 P.2d 1203, 1206–1207 (Alaska 1986).

**12.** *Beilgard*, 896 P.2d at 233.

**13.** *Powell v. Tanner*, 59 P.3d 246, 248 (Alaska 2002); *Braund, Inc. v. White*, 486 P.2d 50, 53–54 (Alaska 1971).

**14.** *State v. Appleton & Cox of California, Inc.*, 703 P.2d 413, 414 (Alaska 1985); *Austin v. Fulton Ins. Co.*, 444 P.2d 536, 540 (Alaska 1968).

But there was nothing in the court's order denying sanctions that implied that Yates would be prohibited from borrowing funds from Briske and Lutz, or from anyone else. The court's ruling was nothing more than a determination that Yates should not be sanctioned for discovery violations.

Halford and VECO also point to two passages in Yates's deposition that they contend prove that Yates lacks "the financial ability to comply with his contractual obligations." The first statement is: "But, see, because I knew from the get-go that I didn't have the . . .—the clout to—to go out and borrow $500,000 to do the remodel and so on. . . ." This is a reference concerning renovations necessary to convert the lodge to make it suitable for Yates's ecotourism plans. The only alteration of the lodge that Yates was contractually required to perform was to replace the roof, surely not the whole subject of the $500,000 remodel that Yates is referring to in the above excerpt.

The second quote is fragmented.

Q: But financially, you alone, I'm not talking about borrowing from anyone else, no matter whom, but you alone were not in a position to accomplish the renovations?
A: That's correct. That's correct.

. . . .

A: Okay. Let me back up one step. The one step is, I alone could not have done this—well, it would have made a heck of a lot of difference if I'd received the $250,000 that I was going to get on the sale [of unrelated property Yates owned in Montana], and that was due in 1996. It obviously didn't happen. So without that, surely, no, I was not able to.

This fragment again is concerned with renovations rather than the purchase price. Further, the fragment is artificially limited to Yates's personal financial resources rather that what he might obtain from his prospective partners or other sources.

VECO claims that Yates admitted by implication in his pro se opposition in response to Halford's summary judgment motion that he has not at all times since the making of the 1997 Agreement been financially able to fulfill his contractual obligations. In his opposition Yates stated: "I certify to the court that my financial circumstances have improved and that with the assistance of potential investors, I would be able to bring the Note payments current." VECO apparently assumes that by using the word "improved" Yates is here conceding that during the litigation he lacked the financial ability to bring the payments current.

VECO's argument is both factually and legally flawed. Factually, because Yates's statement contains no specific time reference and may merely be referring to circumstances in December of 1997 when he missed the quarterly statement and before he tendered the checks that would have brought him current. Legally, because the premise that Yates must at all times during the litigation have had the ability to perform is wrong. Dismissing Yates's suit would give effect to a strict foreclosure. Our case law cautions against strict foreclosure remedies.[15] We have never held that financial inability at an interim point in litigation disqualifies a purchaser from equitable relief that he can afford when the relief is granted. Further, Yates was acting pro se and was responding to allegations made by Halford based on quotes dealing with Yates's ability to make renovations most of which he was not contractually obliged to make. Drawing, as we must, reasonable inferences in favor of the non-movant we conclude that Yates was not admitting an inability to perform the contract after the December 1997 default.[16]

---

**15.** *Kennedy Assocs., Inc. v. Fischer,* 667 P.2d 174, 182 (Alaska 1983) ("[A] forfeiture of contractual rights is to be avoided, whenever possible."); *Hendrickson v. Freericks,* 620 P.2d 205, 212 (Alaska 1980) ("[F]orfeitures are not favored and never enforced in equity unless the right thereto is so clear as to permit no denial.") (quoting *Shoemaker v. Shaug,* 5 Wash.App. 700, 490 P.2d 439, 441 (1971)); *Moran v. Holman,* 501 P.2d 769, 771 (Alaska 1972) ("It is also well established in this jurisdiction that equity abhors a forfeiture and will seize upon slight circum-

stances to relieve a party therefrom . . . where adequate compensation can be made equity discharges the forfeiture, upon such compensation being made." (quotations and citations omitted)); *McCormick v. Grove,* 495 P.2d 1268, 1269 (Alaska 1972) ("A trial court may in its discretion refuse to enforce the forfeiture provisions of a contract if the equities of a particular situation so dictate.").

**16.** *Beilgard,* 896 P.2d at 233.

We conclude that summary judgment was inappropriate based on the grounds offered by Halford and VECO. But we also observe that Halford's showing in support of summary judgment was deficient in other respects as well. He did not show that he had complied with the clause requiring thirty-days notice of default, or that Yates had not timely tendered a cure of any default. Further, he did not show that this case was inappropriate for the sort of equitable relief from strict foreclosure that has frequently been approved by this court.[17]

## III. CONCLUSION

The judgment is REVERSED and this case is REMANDED for further proceedings consistent with this opinion.

⚷394.6(4)

---

**17.** *See, e.g., Moran,* 501 P.2d at 771, and authorities there cited.